## Case No. 16,513.

### UNITED STATES v. THREE RAILROAD CARS.

[1 Abb. U. S. 196;[1] 1 Am. Law T. Rep. U. S. Cts. 114; 7 Int. Rev. Rec. 189.]

District Court, N. D. New York. May Term, 1868.

CONSTRUCTION OF PENAL STATUTES—"WILLFULLY" —FORFEITURE FOR VIOLATING CUSTOM-HOUSE SEALS.

1. To authorize a conviction under a penal statute prescribing a punishment for "willfully"

[1] [Reported by Benjamin Vaughan Abbott, Esq., and here reprinted by permission.]

removing an official seal from property which has been sealed up by officers of the customs, it must appear that the defendant not only intended to remove the seal, but that he had at the time a knowledge of its character. One who removes such a seal in ignorance of its character, and in the honest execution of a supposed duty in the care and transportation of property, is not liable to punishment under the statute, for the reason that he cannot be deemed to have acted willfully.

[Cited in Highway Com'rs v. Ely, 19 N. W. 940, 54 Mich. 180; Minkler v. State, 15 N. W. 331, 14 Neb. 183; State v. Preston, 34 Wis. 685.]

2. The punctuation of a statute, as printed, affords no very decisive test of construction; but may be regarded as one indication of the meaning.

3. To warrant a forfeiture of property, under the last clause of section 5 of the act of June 27, 1864 [13 Stat. 198], for the unauthorized removal therefrom of a custom-house seal, affixed pursuant to other sections of the act. proof must be made that the removal was willful, in the same manner as would be necessary to sustain a conviction and punishment of the offender under the previous clause of the section.

Trial of an information. This information was filed against three railroad cars and three hundred barrels of flour, claimed to be forfeited by reason of an unlawful removal of a custom-house seal while the cars and contents were in course of transportation from Canada into the United States. The property was claimed by the New York Central Railroad Company.

William Dorsheimer, U. S. Dist. Atty., cited [Three Hundred Baskets of Champagne v. U. S.] 3 Wall. [70 U. S.] 145; [Ex parte Bank of New Orleans] 3 How. [44 U. S.] 310; Whart. Cr Law, 401, note s; Act March 3, 1863, § 8 (12 Stat. 740); Act July 28, 1866, § 1 (14 Stat. 328).

A. P. Laning, for claimants, cited 2 Bouv. Dict. 562.

HALL, District Judge. The information in this case is founded upon section 5 of the act of June 27, 1864. Section 1 of this act provides for the unloading and inspection at the first port of entry or custom-house of the United States, of all merchandise and other articles imported into this country from any contiguous foreign country, except as thereinafter provided. Section 2 provides that in order to avoid the inspection at the first port of arrival, as required by section 1, cars, &c., containing such merchandise or other articles may be sealed or closed, under regulations authorized by such act to be prescribed by the secretary of the treasury; "whereupon the same may proceed to their port of destination without further inspection." It also provides that such cars, &c., shall proceed, without unnecessary delay, to their destination, as named in the manifest of their contents, and be there inspected as provided in section 1. Section 3 authorizes the secretary to make regulations for the sealing and closing of cars, &c., and sections 4 and 5 are in the following words:

"Sec. 4. And be it further enacted, that if the owners, master, or person in charge of any vessel, car, or other vehicle, sealed as aforesaid, shall not proceed to the port or place of destination thereof named in the manifest of its cargo, freight, or contents, and deliver such vessel, car, or vehicle, to the proper officer of the customs, or shall dispose of the same by sale or otherwise, or shall unload the same or any part thereof, at any other than such port or place, or shall sell or dispose of the contents of such vessel, car, or other vehicle, or any part thereof, before such delivery, he shall be deemed guilty of felony, and on conviction thereof, before any court of competent jurisdiction, pay a fine not exceeding one thousand dollars, or shall be imprisoned for a term not exceeding five years, or both, at the discretion of the court; and such vessel, car, or other vehicle, with its contents, shall be forfeited to the United States, and may be seized whenever found within the United States, and disposed of and sold as in other cases of forfeiture: provided, that nothing in this section shall be construed to prevent sales of cargo, in whole or in part, prior to arrival, to be delivered as per manifest, and after due inspection.

"Sec. 5. And be it further enacted, that if any unauthorized person or persons shall willfully break, cut, pick, open, or remove any wire, seal, lead, lock, or other fastening or mark attached to any vessel, car, or other vehicle, crate, box, bag, bale, basket, barrel, bundle, cask, trunk, package, or parcel, or anything whatsoever, under and by virtue of this act and regulations authorized by it, or any other act of congress, or shall affix or attach, or in any way willfully aid, assist, or encourage the affixing or attaching by wire or otherwise, to any vessel, car, or other vehicle, or to any crate, box, bale, barrel, bag, basket, bundle, cask, package, parcel, article, or thing of any kind, any seal, lead, metal, or anything purporting to be a seal authorized by law, such person or persons shall be deemed guilty of felony, and upon conviction before any court of competent jurisdiction, shall be imprisoned for a term not exceeding five years, or shall pay a fine of not exceeding one thousand dollars, or both, at the discretion of the court. And each vessel, car, or other vehicle, crate, box, bag, basket, barrel, bundle, cask, trunk, package, parcel, or other thing, with the cargo or contents thereof, from which the wire, seal, lead, lock, or other fastening or mark, shall have been broken, cut, picked, opened, or removed, by any such unauthorized person or persons, or to which such seal or other thing purporting to be a seal, has been wrongfully attached as aforesaid, shall be forfeited to the United States."

The information, after stating the seizure of the property in question, alleges the proper sealing and closing of the three cars containing the three hundred barrels of flour, at Clifton, in Canada, by the consul of the United States, as authorized by the regulations prescribed under the authority of the act of congress; that said cars were permitted, by reason thereof, to enter and pass the port of Niagara without inspection; and that before the said cars arrived at the port of their destination, the seals, by which said cars had been sealed and closed by the consul, were broken, cut, opened, and removed from each and all of the said cars by some unauthorized person, by which such cars and their contents had become forfeited. The information does not allege that such seals were "willfully" broken, cut, opened or removed; nor does it contain any allegation that the same was done willfully or maliciously, or with any fraudulent, corrupt, unlawful, or improper purpose or intent.

The answer of the claimants admits the material allegations of the information, but sets up that the seals of the consul were removed from such cars by mistake, and not willfully, nor for the purpose of violating any act of congress, or any regulation of the treasury; nor for the purpose of interfering with, or removing any of the property contained therein; that said cars were not opened, nor was any of the property therein removed, or interfered with; and that such seals, and the wires to which they were attached, were so removed by an employee of the railroad company, in ignorance of their character, and of their being the seals of the consul, and for the purpose of putting on the doors of the cars a fastening which it had been the custom to place thereon, and thereby make the same more secure.

At the trial the jury returned a special verdict by which they found that the seals of the consul affixed to the cars of the claimants, as stated in the information, were removed by an unauthorized person who was in the employ of the claimants; but that they were so removed in ignorance of the character and purpose of such seals, and without knowing by whom, or why, or for what purpose they had been placed upon said cars; that they were so removed for the purpose of making the fastening of said cars more secure, without any improper or illegal motive or intention, or any desire or purpose to defraud the government, or enable any person to do so; and that no officer, agent, or employee of the claimants aided, or assisted in, or directed or authorized such removal, or in any manner consented thereto.

Upon these pleadings, and this special verdict, the counsel for the claimants insisted, in substance: (1) That in order to a conviction of a person for removing seals under the first clause of section 5, above quoted, it is necessary to show that the removal of the seals was willful; that this was not shown by the evidence in this case, and is negatived by the special verdict. (2) That the forfeiture declared by the last sentence of the section is only a further penalty for the commission of the act made criminal by the preceding sentence, and that there can be no forfeiture unless the

facts proved would justify a criminal conviction of the party by whom the seals were removed.

1. The first question thus presented depends mainly upon the signification, purpose, and effect of the term "willfully," as used in the section referred to; and it must be conceded that the question is not free from doubt. The words "knowingly," "willfully," and "maliciously," either singly or united, or one of them connected with another, have been frequently used in criminal and penal statutes; but their signification and effect have not been, and cannot be, so precisely defined that different interpretations are not required in different cases,—depending to some extent upon the connection in which they are found. The first of these words does not, in common parlance, or in legal construction, necessarily and per se, imply wicked purpose or perverse disposition, or indeed any evil or improper motive, intent, or feeling; but the second is ordinarily used in a bad sense to express something of that kind, or to characterize an act done wantonly, or one which a man of reasonable knowledge and ability must know to be contrary to his duty. The last of these terms, "maliciously," in its ordinary sense, and when used in criminal or otherwise penal statutes, implies the existence of a wicked, base, or revengeful purpose, or an evil disposition and wanton disregard of the rights of others; though in its technical sense, as used in the merely formal, though necessary allegations of an indictment, it generally has a less noxious signification, implying that legal malice which is presumed to exist whenever any unlawful and injurious act is voluntarily committed, rather than the actual existence of malignant feeling and evil purpose. In its ordinary sense, and when used in statutes, it is generally considered as including the term "willfully," and something more; and it has therefore been held that in an indictment founded on a statute requiring the act charged to be willfully done in order to make it criminal, charging that the act was done "maliciously" was sufficient; but when the words "willfully and maliciously" are both used in the statute creating the offense, it was held that both must be used in the indictment, and that an allegation that the act was done "unlawfully and maliciously" was not sufficient. Archb. Cr. Prac. 50. The definitions given by our best lexicographers, as well as the authority of legal writers, show that "willfully" is ordinarily used in a bad sense. Webster, whose definitions are most reliable, gives as the proper definition of "willful," in its present use, "governed by the will without yielding to reason; obstinate; perverse; inflexible; stubborn; refractory;" and he gives as the definition of "willfully," "in a willful manner; obstinately; stubbornly."

Upon the best consideration I have been able to give to this case and to the authorities which my researches have discovered, I am quite confident that neither the evidence nor the special verdict will justify the conclusion that the removal of the seals of the consul, as found by the verdict, was "willful," within the meaning and intent of the act of congress. It is true, that a person who deliberately does an act which he knows to be unlawful, or wrongful, is generally held to have done it willfully; and the familiar doctrine that a person is conclusively presumed to know the law of the country of his domicil or temporary sojourn, was pressed upon the court for the purpose of bringing this case within the principle of the cases in which this doctrine has been applied. Without considering the question whether the regulations presented by the secretary of the treasury, under an act of congress, are to be considered as laws, it must be observed that in all cases of this kind the intention of the legislature is to govern; and that when, as in this case, the act must be willfully done to make it criminal, it can hardly be supposed that the legislature intended to declare an act committed without any illegal or improper motive, and under the honest belief that it was entirely right and proper, to be a felony punishable, in the discretion of the court, by a large pecuniary fine and five years' imprisonment. Indeed, under such proof of the absence of all criminal or improper intent or feeling, eminent judges have directed acquittals in cases where the punishment authorized was much less severe.

In the case of U. S. v. Hart [Case No. 15,-316], Mr. Justice Washington held that a constable who stopped and detained the mail-coach, by arresting the driver because he was driving through the streets of Philadelphia at a speed which was considered dangerous to the persons of its citizens, was entitled to a verdict of not guilty on an indictment founded upon a statute making it criminal for any person "knowingly and willfully to obstruct or retard the progress of the mail;"—the judge holding that driving at a dangerous speed, upon the streets of the city, was a breach of the peace and an offense at common law, and authorized an arrest of the offender without a warrant;—and that it could not therefore be said that the act was a willful stopping of the mail;—and this decision was referred to and approved by Mr. Attorney-General Crittenden, in an opinion furnished the postmaster-general in 1852. I am aware that the authority of Mr. Justice Washington's decision may be said to have been shaken by the decision of Mr. Chief Justice Taney in U. S. v. Harvey [Case No. 15,320]. The chief justice felt it to be his duty to follow a decision, made in the same district, by Judge Winchester; and which he supposed to be in conflict, to some extent, with Mr. Justice Washington's decision; and he therefore decided that arresting and detaining the mail-carrier, under civil process, and thereby obstructing and retarding the progress of the mail, justified a conviction of the constable who made the arrest. This decision, and the case of People v.

Brooks, 1 Denio, 457, and other analogous cases, have raised doubts upon the question now under consideration; but the decision of the chief justice was made during the hurry of a circuit, and it is quite certain that the case before Judge Winchester was clearly distinguishable from those before Mr. Justice Washington and the chief justice, for reasons which do not appear to have been considered by the latter. In the case before Judge Winchester the defendant was a private individual who had detained the mail by holding possession of the horses employed in its transportation, on the ground that he had a lien on them for food furnished for them, while engaged in that employment, prior to such detention; and Judge Winchester evidently reached the conclusion that no such lien existed, even against the owner of the horses, and that it was entirely clear that no such lien could be enforced against the right of the government to use the horses in the transportation of the mail. The act of detention was intentional and deliberate, and under such circumstances that the defendant was bound to know that it was without legal right, and in violation of law; and, it was therefore held to be an offense under the statute. In the case before Judge Washington the defendant was in the execution of what he believed to be his duty as a peace-officer; and in that before the chief justice the defendant was a constable, holding a civil process to arrest the mail-carrier, and he may well have supposed it to be his duty to execute the process in his hands. If he acted upon his honest conviction of duty, without improper motive or feeling, I confess my inability to assent to the propriety of his conviction. In short, I cannot believe that congress, when expressly requiring that the act should be willful, intended to subject a public officer to indictment and punishment for honestly endeavoring to do what he really believed to be his official duty. I cannot believe that congress, when it required the act to be willful, intended that an honest mistake upon a question of law, in respect to which the opinions of such eminent judges as Mr. Justice Washington and Judge Winchester had been opposed, and which had not been settled by any later decision, should be punished as a crime.

This decision of the chief justice, and others which serve to sustain, to some extent, the position of the district-attorney, were doubtless based upon the maxim that "ignorance of the law excuses no one," and in accordance with which a party is legally presumed to know what the law is, even when the question depends upon the intent and meaning of an act of congress of which he has never heard, and in regard to which the opinions of judges and lawyers are not only in opposition but almost equally divided; and it can hardly be doubted that the term "willfully" is sometimes, if not generally, introduced into criminal and penal statutes to prevent the gross injustice that might otherwise be perpetrated in the strict application of the rule which requires this legal presumption in opposition to the real truth of the case.

But there is another view of the case which deserves consideration. The maxim "Ignorantia juris non excusat," has its co-relative in the maxim "Ignorantia facti excusat." Broom Leg. Max. 122. And while ignorance of the law, which every man is presumed to know, does not excuse, ignorance of a material fact may excuse a party from the legal consequences of his acts; more especially when such acts are criminal only when willful. Thus, if a man, believing a woman to be unmarried and free, marries her when she is in fact a married woman, he will not be criminally responsible. So, under the statute against willfully obstructing the passage of the mail, the stopping of a private carriage and horses, although such carriage and horses might at the time be actually employed in the transportation of the mail, would not be criminal if the fact of such employment was unknown to the party charged, and he had no reason to suspect the fact of such employment. Even where an act of congress had made it criminal to cut or remove timber from the lands of the United States, without expressly requiring that the act should be willfully, or even knowingly done, it would seem to have been the opinion of the learned judge of the district of Michigan that evidence showing mistake, ignorance of the section lines, and a well founded belief that the timber was being removed from other lands than those of the United States, would constitute a good defense. U. S. v. Schuler [Case No. 16,234]. And under an indictment for knowingly and willfully obstructing or resisting an officer in the discharge of his duties, it is well settled that it must be proved that the party charged had knowledge or notice that the party obstructed or resisted was an officer, and engaged in such official duties. Whart. Cr. Law, §§ 1289, 1290; and see 5 Mass. 455; Reed v. Davis, 8 Pick. 515.

As the party who removed the seals in this case was wholly ignorant of their character and purpose, it may be doubtful whether he would have been guilty of an offense under section 5, so often referred to, even if the word "willfully" had not been used as descriptive of the criminal offense; and, upon the statute as it stands, and the whole case, I am of the opinion that neither the evidence nor the facts found by the jury would justify a conviction of the person who removed the consular seals, as alleged in the information. To convict a person of willfully removing official seals under proof clearly showing the absence of any will or intent to do that or any other unlawful or improper act, would seem to be palpably unjust. But the question which has now been discussed at great length is not, in strictness, involved in this case. The information does not allege that the seals were

willfully removed, and the verdict of the jury establishes the fact that they were removed in ignorance of their character and purpose, and without improper or illegal purpose, motive, or intent.

Now, it is very clear. as a question of pleading, that the omission of the allegation that the seals were willfully removed, —this being absolutely necessary to the statutory definition of the offense intended to be charged,—would be fatal in an indictment against a party charged with such removal, unless, indeed, the sense of the word "willfully" was legally embraced in some other word used to characterize the act. This must dispose of the case, if the second position of the counsel for the claimants can be maintained. It is true that, in a proper case, a court might allow a defect of that kind to be remedied by an amendment; but, under the proofs in this case, it is clear no amendment of that kind should be allowed. The 'evidence showed that the seals were removed by a subordinate employé of the claimants, who had been directed by the station agent to put upon the cars the leaden seal of the station, and had him furnished with leaden blanks for that purpose; that the station seal had been usually placed on a peculiar kind of lock, which had been in use on the cars, and on which said leaden blanks for the station seal were intended to be used; that when this employé went to the cars to affix the station seals, he found no locks upon the cars, and could not, therefore, do as he nad been directed without placing the locks thereon; that he went to the depository of such locks, in the station, and obtained the necessary locks, and put the same on the 'cars, and affixed the station seal thereto; that he found that in order to put said locks and the station seals on the cars, it was necessary to remove the wires and leads that he found thereon, and that he did so remove the same for that purpose, and after having done so, reported the facts to the station agent; that the station agent, understanding from this report that consular seals had been removed, immediately went with the person who removed them, to the consul at Clifton. and reported the facts and circumstances of such removal; that the consul declined doing anything in the matter, as his duties were to be discharged in Canada, and directed the station agent to report the facts to the collector on this side; that affidavits showing the mistake, and the facts in regard to the removal. were made by the station agent and the employé, but that the collector seized the property and insisted upon the forfeiture. Under such proof, and the finding of the jury in this case, no court should allow an amendment, in order to decree a forfeiture of the property of parties entirely free from all suspicion of blame.

This point upon the pleadings was not rais-

ed upon the argument, and it did not occur to me afterwards until I had nearly completed my examination of the authority I have referred to. Having performed the labor of searching for and examining the authorities, I have thought it better to express my opinion upon both the questions argued, rather than to dispose of the question of the construction and effect of the first sentence of section 5 of the statute, upon the ground that no willful removal of the seals is alleged in the information. If the question were now evaded, I might soon be called upon to decide it upon an indictment.

The remaining question which was argued by counsel is, in substance, whether the last sentence of section 5,—which declares the forfeiture,—is so connected with and dependent upon the preceding sentence that a willful removal of the consular seals must be alleged and proved to entitle the government to a forfeiture of the property in controversy; and it need hardly be said that the question is not free from doubt. The latter part of the section is closely connected with the first by its general relation to the same subject matter, and by a copulative conjunction; and without such connection, or some reference to prior provisions of the act, the last sentence of the section would be wholly inoperative. And there is certainly much reason for saying that the forfeiture provided for is intended as a cumulative penalty for the commission of the act just made criminal. The word "such" in the expression "such unauthorized person," can only refer to the person just referred to,—that is, one who has willfully removed the seals just described; and these indicia, though not controlling, must strengthen the probabilities that congress did not intend to declare that consequences so penal as the forfeiture of the merchandise of an entire stranger to the transaction, and of a carrier wholly innocent of blame, should be visited upon such parties, because a third person, equally innocent of improper or unlawful intentions, had, by mistake, and in ignorance of their character and purpose, removed the seals of a government agent. It may well be that congress intended that property owners and carriers should be responsible for the integrity and good faith of those to whom they had intrusted the care of merchandise and property, passing through the country under official seals; but it can hardly be supposed that this responsibility was intended to be extended to a case like the present.

The words "as aforesaid," near the close of the section, may have been intended to apply to the first as well as to the last portion of the sentence, and if a comma were inserted immediately before these words, as well as after them, such would, I think, be the necessary construction of the sentence. There is, however, no comma' immediately before those words, and though the punctuation of a

statute, as printed, affords no very decisive means for determining its construction, yet, so far as it affects the question, the punctuation is undoubtedly an indication that the words "as aforesaid" are only intended to apply to the affixing and not to the removing of seals.

But a strong argument in favor of giving these words a broader application may be based upon the fact that they would seem to have no effect unless they can be applied to the first branch of the sentence. The word "such" precedes the words "seals, or other thing purporting to be a seal," and the word "wrongfully" is used in respect to the attaching of seals, so that there would seem to be no reason for using the words "as aforesaid" in regard to the attaching of seals, whilst their use in respect to the removal of seals would render it clear that the forfeiture for such removal was intended only when such removal was willful.

After a careful consideration of the language of the act, I am strongly inclined to the opinion that in order to produce a forfeiture there must be proof that the consular seals were willfully removed. It must be conceded that the construction which I have deemed it my duty to give to the statute on which the proceedings in this case have been based, is not free from doubt; but if the questions discussed were more doubtful, and even if the judicial mind was slightly inclined to the opposite construction, rather than to the one now adopted, it is supposed that in a case like this, involving a forfeiture, and when no improper motive existed. the final judgment of the court. should still be for the claimants. In the case of The Enterprise [Case No. 4,499], Mr. Justice Livingston said: "A court has no option when any considerable ambiguity arises on a penal statute, but is bound to decide in favor of the party accused;" and although this doctrine ought not to be acted upon except in a case of serious and considerable doubt, it may well be considered as relieving a court from all embarrassment in deciding a case like the present.

The claimant must have judgment upon the special verdict, but, as the law of the case was unsettled and doubtful. the usual certificate of probable cause will be granted, notwithstanding the fact that I have a very decided opinion that the case is one which should not have been prosecuted. After the facts had been made known to the collector, and the removal of the seals had been shown by affidavit to have been made by mistake, the collector would have, in my judgment, done all that his duty required if he had directed the cars to be returned to the Canada portion of the suspension bridge, and procured the consul to renew the seals thereon. And if the consul had declined to do so, I think the collector might then have properly taken other measures to secure the government against injury by reason of the mistake made by the railroad employee, and even advised the remission of the forfeiture, if any one had claimed that a forfeiture had been incurred.

Decree accordingly.