## POTTER *v.* UNITED STATES.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF MASSACHUSETTS.

No. 531. Argued November 14, 15, 1894. — Decided December 17, 1894.

In an indictment for a statutory offence, while it is doubtless true that it is not always sufficient to use simply the language of the statute in describing the offence, yet, if such language is, according to the natural import of the words, fully descriptive of the offence, then ordinarily it is sufficient.

A charge in an indictment that the defendant was president of a national bank, and as such on a day and at a place named unlawfully, knowingly, and wilfully certified a certain cheque, (describing it,) drawn upon the bank, and that the drawer did not then and there have on deposit with the bank an amount of money equal to the amount specified in the cheque, is a sufficient averment of the offence described in Rev. Stat. § 5208, the punishment for which is provided for in the act of July 12, 1882, c. 290, 22 Stat. 162, 166.

As it is of the essence of the offence against those acts that the criminal act should have been done wilfully, a person charged with it is entitled to have submitted to the jury, on the question of "wilful" wrongdoing, evidence of an agreement on the part of the officers of the bank that it should be treated as a loan from day to day, secured by ample collateral,

and that for the cheque certified each day there was deposited each day an ample amount of cash.

In a criminal trial the burden of proof is on the government, and the defendant is entitled to the benefit of a reasonable doubt; and when testimony contradictory or explanatory is introduced by the defendant, it becomes a part of the burden resting upon the government, to make the case so clear that there is no reasonable doubt as to the inferences and presumptions claimed to flow from the evidence.

By section 5208 of the Revised Statutes it is provided that "it shall be unlawful for any officer, clerk, or agent of any national banking association to certify any cheque drawn upon the association unless the person or company drawing the cheque has on deposit with the association, at the time such cheque is certified, an amount of money equal to the amount specified in such cheque."

No penalty was imposed on the individual for a violation of this section. But on July 12, 1882, c. 290, 22 Stat. 162, 166, it was enacted:

"SEC. 13. That any officer, clerk, or agent of any national banking association who shall wilfully violate the provisions of an act entitled 'An act in reference to certifying cheques by national banks,' approved March third, eighteen hundred and sixty-nine, being section fifty-two hundred and eight of the Revised Statutes of the United States, or who shall resort to any device, or receive any fictitious obligation, direct or collateral, in order to evade the provisions thereof, or who shall certify cheques before the amount thereof shall have been regularly entered to the credit of the dealer upon the books of the banking association, shall be deemed guilty of a misdemeanor, and shall," etc.

In May, 1892, the defendant was indicted in the Circuit Court of the United States for the District of Massachusetts for a violation of these sections. The indictment contained eighty-eight counts. By demurrer and *nolle* the last forty-eight counts were disposed of before the trial, which proceeded upon the first forty. In these forty counts the unlawful certification of five cheques was charged, the first eight counts relating to one cheque, the next eight to another, and so on. The case came on for trial in February, 1893, and resulted in

a verdict of guilty on fifteen counts, three in respect to the certification of each cheque. A motion for a new trial having been overruled, the defendant was sentenced to pay a fine of $1000, and to be imprisoned in jail for the term of sixty days. To reverse this judgment the defendant brought this writ of error.

The third count in the indictment, which was one of those upon which the defendant was found guilty, after stating time and venue, and that the defendant was president of the Maverick National Bank and authorized to lawfully certify cheques, charged "that said Potter as such president as aforesaid did then and there, to wit, on said twenty-third day of July, at Boston aforesaid, within said district and within the jurisdiction of this court, unlawfully, knowingly, and wilfully certify a certain cheque, which said cheque was then and there drawn upon said association for the amount of twenty-four hundred and fifty dollars by certain persons, to wit, Irving A. Evans, Austin B. Tobey, and William S. Bliss, copartners, then and there doing business under the firm name and style of Irving A. Evans and Company, and which said cheque was then and there of the tenor following — that is to say:

'Boston, *Jul-* 23, 1891.    $2450.    No. 54493.

Maverick National Bank.

Pay to the order of Hayward & Townsend $2450, twenty-four hundred & fifty dollars.

Irving A. Evans & C-.'

by then and there writing, placing, and putting in and upon and across the face of said cheque the words and figures following — that is to say:

'Maverick National Bank.

Certified Jul- 23, 1891.

Pay only through clearing-house.

A. P. Potter, *P.*'

(meaning said Asa P. Potter, such president as aforesaid).

'—— ——, *Paying Teller.*'

that the said persons, as copartners under the firm name and style as aforesaid, by whom said cheque was then and there drawn as aforesaid, did not then and there, to wit, at the time said cheque was so certified by said Potter as aforesaid, have on deposit with said association an amount of money then and there equal to the amount then and there specified in said cheque, to wit, the amount of twenty-four hundred and fifty dollars in money, as he, the said Potter, then and there well knew, against the peace and dignity of the said United States and contrary to the form of the statute in such case made and provided."

All the counts upon which the defendant was found guilty, both in respect to this and the other cheques, were, so far as any question is involved in this case, substantially like the one quoted.

On the trial the books of the bank were presented, showing that at the time these five cheques were certified the account of Evans & Co. was overdrawn in a large sum — between $100,000 and $200,000. There was testimony tending to show that upon each day that these cheques were certified, and prior thereto, Evans & Co. deposited in cash an amount more than sufficient to cover the certifications. Thereupon, as the bill of exceptions shows —

"The defence called the defendant, Mr. Potter, and offered to prove by him an oral agreement between I. A. Evans & Co. and the Maverick National Bank, in the early part of 1891, before June or July, 1891, that Evans & Co. might have a loan by overdraft limited to $200,000, with interest to be charged daily at the rate of six per cent, against which collateral was to be put up, and further to show that the overdrafts existing in June and July, 1891, were under this agreement, and that collateral was actually deposited and kept against it in the hands of the assistant cashier; that this agreement was communicated to the executive officers of the bank and to a majority of the directors of the bank, who approved it, and this offer was made in connection with the facts that appear in evidence in relation to the books of the bank; also the defence offered another conversation between

Mr. Potter and Mr. Evans in relation to the matter of certifi-
cation of cheques and deposits connected with this certification,
in which Mr. Evans called his attention to the fact that a
cheque had been refused certification, and Mr. Potter told Mr.
Evans that it was undoubtedly because he had no deposit
there.    Whereupon Mr. Evans said, 'But I have a loan, as I
understand it;' to which Mr. Potter replied substantially,
'We cannot certify cheques against a loan; if you are going
to have certified cheques you must have deposits in the bank
to certify them against;' and that from that time forward the
deposits were in, to Mr. Potter's knowledge, from day to day
after this conversation with Mr. Evans, in which the defence
claims that the parties to the conversation understood distinctly
that the daily deposits were to be in for the very purpose of
certifying cheques.

"This whole offer was made by the defence as material
matter of substantive defence, as a part of the *res gestæ* and
of the transaction, and as specifically bearing upon the ques-
tion of criminal intent upon the part of the defendant.    The
facts 'that appear in evidence in relation to the books of the
bank,' as referred to in the above offer and in connection with
which the offer is made, are heretofore fully stated in this bill
of exceptions."

And in pursuance of this offer the defendant asked the wit-
ness certain questions, for the purpose of showing a state of
facts, as indicated in the offer, but the testimony was rejected,
the court saying, in response to an inquiry of counsel as to
whether "a definite agreement" was ruled out —

"Yes, sir; I rule out anything that does not appear on the
books of the bank in connection with this deposit.    I think
what was on deposit and not on deposit as the case now
stands must be determined by what appears on the books of
the bank — as this case now stands — and the papers of the
bank."

Exceptions were duly taken to the action of the court in
this respect.

Among other instructions to the jury was the following:

"But, upon some reflection, I have come to the conclusion

that notwithstanding Evans & Co. may have been overdrawn on the morning of any particular day and during the whole of that day, yet if the bank did in fact receive a special deposit and set aside certain cheques or other moneys and hold them for the purpose of covering the certified cheques, that it would not be any violation of the letter or policy of the statute and would be a defence. But I must say, gentlemen, that I am unable to see in this case any evidence that anything of that sort was done. I am unable to see in the case any evidence — I do not mean to say evidence of what was intended or agreed to be done, which is not essential to this case, but any evidence that as a matter of fact any of these cheques deposited by Evans & Co. did not go into the general deposit account and were not absorbed the instant they passed into the bank. Upon this branch of the case I instruct you the burden of proof is on the defence — not proof beyond a reasonable doubt, but to satisfy you by a preponderance of evidence. If the defence does satisfy you by the preponderance of evidence that there was a segregation in fact appearing upon or shown from the books and papers of the bank — a segregation, a setting apart of certain deposits sufficient to cover the certified cheques and against which the cheques were certified — it is a defence in this case."

To the giving of which instruction the defendant at the time duly excepted.

*Mr. W. S. B. Hopkins* and *Mr. Henry D. Hyde,* (with whom was *Mr. William A. Sargent* on the brief,) for plaintiff in error.

*Mr. Assistant Attorney General Conrad* for defendants in error.

MR. JUSTICE BREWER, after stating the case, delivered the opinion of the court.

The only questions which we deem it material to consider are those presented by the foregoing extracts from the record. The first is, was the indictment sufficient?

It is objected that " certification," to constitute an offence

within the scope of the statute, must be such an act or series of acts as creates a contract binding upon the bank; that a mere writing of the word "certified" on a cheque does not, until delivery to some person, have any such effect; and that while an indictment, charging simply in the language of the statute that the defendant wrongfully certified a cheque, might carry an implication that the cheque was not only written upon but also delivered so as to complete the contract included in the word "certification," yet here the pleader has limited the scope of those words by a particular statement of what the defendant did, which statement does not include the matter of delivery. Every allegation made in the indictment might, it is said, be satisfied by proof that the defendant, finding on his table a cheque of the form described, wrote the words thereon as charged, and then tore the paper up and threw it in the fire, or disposed of it in some other way so as not to create any obligation against the bank.

We think this is placing too narrow a construction on the indictment. The offence charged is a statutory one, and while it is doubtless true that it is not always sufficient to use simply the language of the statute in describing such an offence, *United States* v. *Carll*, 105 U. S. 611, yet if such language is, according to the natural import of the words, fully descriptive of the offence, then ordinarily it is sufficient.

The word "certify" as commonly understood implies that the cheque, upon which the words of certification have been written, has passed from the custody of the bank and into the hands of some other party, and when the charge is that the defendant "did unlawfully, knowingly and wilfully certify a certain cheque," the import of that accusation is not simply that he wrote certain words on the face of the cheque, but that he did it in such a manner as to create an obligation of the bank; in such a way as to make an instrument which can properly be called a certified cheque. And the subsequent recital, "by then and there writing, placing, and putting in and upon and across the face of said cheque the words and figures following," etc., is not to be taken as absolutely limiting the import of the word "certified" to the mere act of so

writing, placing, etc., but as simply descriptive of the form of the certification — of that which he personally did. It was not necessary, to constitute the offence, that he should himself deliver the cheque to some third party outside the bank, or even that he should take any part in such delivery. His offence would be complete if, after he had written the words of certification as stated, with the intent that they should be used to create a contract on the part of the bank, the actual delivery had been made by some clerk or other officer of the bank without his actual knowledge. The full details of the transaction by which the words written by him upon the face of this instrument became operative to make it a "certified cheque" were matters of evidence rather than of allegation. An unlawful certification is in terms charged, and the form of the writing creating the certification is given.

It is generally true as claimed that where an indictment is unnecessarily descriptive, even the unnecessary description must be proved as laid; but that proposition does not seem to be in point, for it is not claimed that the testimony did not show just such a writing as is charged to have been made by the defendant, and surely it cannot be claimed that unnecessary matter of description must be proved otherwise than as it is stated. While there is plausibility in the contention of counsel, yet we think it would be giving an unnecessary strictness to the language of the indictment to adjudge it insufficient, or to hold that it failed to inform the defendant exactly of what he was accused, or lacked that precision and certainty of description which would enable him to always use a judgment upon it as a bar to any other prosecution; and that, as we all know, is the substantial purpose of a written charge.

The next question relates to the admissibility of the testimony which was offered and rejected. The charge is of a wilful violation. That is the language of the statute. Section 5208, Revised Statutes, makes it unlawful for any officer of a national bank to certify a cheque unless the drawer has on deposit at the time an equal amount of money. But this section carries with it no penalty against the wrongdoing

officer. Section 13 of the act of 1882 imposes the penalty, and imposes it upon one "who shall wilfully violate," etc., as well as upon one "who shall resort to any device," etc., "to evade the provisions of the act;" "or who shall certify cheques before the amount thereof shall have been regularly entered to the credit of the dealer upon the books of the banking association." The word "wilful" is omitted from the description of offences in the latter part of this section. Its presence in the first cannot be regarded as mere surplusage; it means something. It implies on the part of the officer knowledge and a purpose to do wrong. Something more is required than an act of certification made in excess of the actual deposit, but in ignorance of that fact or without any purpose to evade or disobey the mandates of the law. The significance of the word "wilful" in criminal statutes has been considered by this court. In *Felton* v. *United States*, (96 U. S. 699, 702,) it was said:

"Doing or omitting to do a thing knowingly and wilfully, implies not only a knowledge of the thing, but a determination with a bad intent to do it or to omit doing it. 'The word "wilfully,"' says Chief Justice Shaw, 'in the ordinary sense in which it is used in statutes, means not merely "voluntarily," but with a bad purpose.' 20 Pick. (Mass.) 220. 'It is frequently understood,' says Bishop, 'as signifying an evil intent without justifiable excuse.' Crim. Law, vol. 1, § 428."

And later, in the case of *Evans* v. *United States*, 153 U. S. 584, 594, there was this reference to the words "wilfully misapplied:"

"In fact, the gravamen of the offence consists in the evil design with which the misapplication is made, and a count which should omit the words 'wilfully,' etc., and 'with intent to defraud,' would be clearly bad."

Now, it is not disputed that if the overdraft had in form been cancelled on the books of the bank and a note taken for the amount thereof, so that the obligation of Evans & Co. was evidenced only by a note, and not left as an open account, this particular section of the law would not be applicable, and any wrong done by the defendant in making or continuing

such a loan would have to be punished by proceedings under some other section. If at the opening of the account a note of $200,000 had been discounted and the amount entered to the credit of Evans & Co., the certifications complained of would not have been in violation of this section, because the credit side of the account would always have been in excess of the certifications; or if, at the close of each day's business, a note had been taken for the balance due the bank and the open account cancelled, the same result would follow, because each morning before any certification an amount in money was deposited larger than the total certifications of the day. The testimony offered tended to show an agreement on the part of the officers of the bank to treat this overdraft as a loan, drawing interest and secured by collateral, and that such agreement was carried into effect by the deposit of the collateral and the casting up of interest. If the defendant in good faith supposed that this arrangement was the equivalent of a loan by note, and that the indebtedness of Evans & Co. was fully secured by collateral, it seems to us that the jury would have a right to be informed of the fact as bearing upon the question whether he had "wilfully" violated the statute. It cannot be that the guilt or innocence of the defendant under this indictment turns upon the mere matter of bookkeeping. While it is true that care must be taken not to weaken the wholesome provisions of the statutes designed to protect depositors and stockholders against the wrongdoings of banking officials, it is of equal importance that they should not be so construed as to make transactions of such officials, carried on with the utmost honesty and in a sincere belief that no wrong was being done, criminal offences, and subjecting them to the severe punishments which may be imposed under those statutes. We must not be understood as holding that this testimony established an absolute defence, and that by the form of such an agreement the mandatory terms of section 5208 can be evaded, but only that evidence of a positive agreement upon the part of the officers of the bank that this overdraft account should be practically treated as a loan from day to day, to be and in fact secured by ample collateral — coupled with testi-

mony that for the cheques certified each day there was deposited in advance an ample amount of cash — should have been submitted to the jury on the question of " wilful" wrongdoing. As " wilful" wrong is of the essence of the accusation, testimony bearing directly on the question of wilfulness is of vital importance, and error in rejecting it cannot be regarded otherwise than as material and manifestly prejudicial.

The remaining question is in reference to the instruction as to the burden of proof. We think that, so far as respects the particular matter mentioned in the instruction quoted, the rule remains as in other phases of a criminal trial; that the burden of proof is on the government, and the defendant is entitled to the benefit of a reasonable doubt. It may be that certain presumptions follow from the entries in the books, and accompanying testimony introduced by the government. It may also be that those presumptions are conclusive in the absence of contradictory or explanatory testimony, and, in that aspect of the case, that the defendant must introduce something to weaken the otherwise conclusive force of such presumptions; but whenever testimony thus contradicting or explaining is introduced, it becomes a part of the burden resting upon the government to make the case so clear that there is no reasonable doubt as to the inferences and presumptions claimed to flow from the books or other evidence.

*Judgment reversed, and new trial ordered.*