## REEVES v. STATE.  (No. 2846.) *

(Court of Civil Appeals of Texas. Texarkana.
Jan. 25, 1924.  Rehearing Denied
Feb. 7, 1924.)

**1. Sheriffs and constables ⬦⟶6—Sheriff cannot be removed for misconduct during prior term.**

Under Rev. St. arts. 6030–6055, as to removal from office for official misconduct, etc., but expressly providing that no officer shall be removed for any act committed prior to his election, a sheriff cannot be removed for misconduct during a previous term.

**2. Sheriffs and constables ⬦⟶6—Proof of misconduct during prior term held not to render removal for misconduct in present term erroneous.**

The fact that charges against sheriff included misconduct during a prior term did not render removal of sheriff erroneous where the jury found separately on the different charges; proof of the charges during the prior term being harmless under Rev. St. arts. 6030–6055.

**3. Quo warranto ⬦⟶33—Proceeding for removal from office must be prosecuted in name of state.**

Under Rev. St. art. 6042, a proceeding to remove a sheriff from office must be instituted and prosecuted in the name of the state, through the proper officer of the state, and a private citizen is not possessed of legal·capacity or right to institute or maintain such suit.

**4. Judges ⬦⟶45—Private relators in proceeding to remove sheriff for misconduct not parties as respects disqualification of judge.**

In a quo warranto proceeding under Rev. St. art. 6042, to remove a sheriff for misconduct, private relators have no private interest in the proceeding, and are not parties to the cause, so that their relationship to the judge would disqualify him, especially where, upon objection, the pleadings are amended so as to eliminate parties related to the judge, and costs were paid up to that date.

**5. Judges ⬦⟶56—Interested judge may grant leave to amend.**

The mere granting of leave to file an amendment to pleading is merely a formal order where nothing is decided, and one which an interested judge may enter.

**6. Appearance ⬦⟶20—Notice and new service on amendment waived by announcing ready for trial.**

If sheriff in quo warranto for his removal was entitled to notice or new service upon amendment of the pleadings, he waived such service when he "announced ready for trial" without requesting postponement or continuance.

**7. Quo warranto ⬦⟶58—Form of verdict submitted held proper.**

Merely to prepare a form of verdict so as to enable the jury to make findings in accordance with Rev. St. art. 6043, providing that, where there is more than one distinct cause of removal alleged against the officer, the jury shall by their verdict say which cause

they find sustained by the evidence, and which are not sustained, does not violate the terms of the statute.relating to form of verdicts.

**8. Sheriffs and constables ⬦⟶6—Evidence held to warrant finding of misconduct warranting removal.**

.In quo warranto for removal of a sheriff under Rev. St. arts. 6030–6055, evidence *held* to warrant finding of jury that sheriff protected persons violating the prohibition law.

**9. Officers ⬦⟶66—"Willful" misconduct warranting removal of officer defined.**

The word "willful" used in respect to misconduct warranting the removal of an officer is used in the sense of a conscious and intentional failure or refusal to perform or keep inviolate any duty imposed upon the officer by law.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Willful—Willfully.]

Appeal from District Court, Titus County; R. T. Wilkinson, Judge.

Proceeding by the State in the nature of a quo warranto to remove John J. Reeves from the office of Sheriff of Titus County. The defendant was removed, and he appeals. Affirmed.

This is a proceeding under the statute, in the nature of a quo warranto, in the name of the state of Texas, upon the relation of the district and county attorneys, and represented by them, to remove from office the sheriff of Titus county for alleged official misconduct. The accusations filed against the respondent are alleged in the complaint, substantially stated, as follows:

(1) That J. J. Reeves, while sheriff of Titus county, and during the year 1921, knowingly and willfully, and for pay therefor, protected, aided, and encouraged Arthur Tigert in the continuous violation in Titus county of the laws of Texas against the manufacture of spirituous, vinous, and malt liquors capable of producing intoxication, in that "the said J. J. Reeves, the duly elected, qualified and acting sheriff of Titus county, Tex., in·his office in the courthouse in the town of Mt. Pleasant, Titus county, Tex., agreed with Arthur Tigert that for the payment to him by Arthur. Tigert, which was done, of $50 per month, payable monthly, that the said Arthur Tigert might and could continue, which he did, to manufacture in Titus county spirituous, vinous, and malt liquors capable of producing intoxication, in violation of the laws of Texas, and to protect the said Arthur Tigert from any criminal prosecution in the state courts in said county, and to inform him of the presence of any federal enforcement officers in the said county, and to notify him of any prospective raids or attempts on the part of enforcement officers to catch the said Arthur Tigert in the manufacture of said liquor. * * * And the said J. J Reeves fully carried out his agreement, as set out, in violation of his oath of office and in violation of the law of the state of Texas."

(2) That J. J. Reeves, while sheriff of Titus

---

county, and during the year 1921, knowingly and willfully, and for pay therefor, protected, aided, and encouraged Jesse Godsey in the continuous violation in Titus county of the laws of Texas against the manufacture of spirituous, vinous, and malt liquors capable of producing intoxication, in that (here follow substantially the same averments of agreement as in charge 1, supra).

(3) That J. J. Reeves, while sheriff of Titus county, and during the year 1921, (1) "caused Clem Gray to transport from Mt. Pleasant, Tex., to Dallas, Tex., and there to sell same, all in violation of law, whisky captured by the said J. J. Reeves as sheriff of said Titus county while making raids on stills in Titus county, and held by him as sheriff," and (2) "sold to Clem Gray, in violation of law, about 70 gallons of spirituous, vinous, and malt liquors capable of producing intoxication, which was captured by him as such sheriff while making raids on stills in Titus county."

(4) That J. J. Reeves, while sheriff of Titus county, knowingly and willfully protected, aided, and encouraged Ed. Milner, and expressly agreed with Ed. Milner that for pay he might and could continue to violate in Titus county the laws of the state of Texas against the manufacture of spirituous, vinous, and malt liquors capable of producing intoxication, in this: (1) That "in the year 1921, at different times," and "during some of the year 1922," Ed. Milner paid to J. J. Reeves, "in his office in the courthouse in Mt. Pleasant, Titus county, Tex.," and J. J. Reeves received it, "$50 per month up to and until J. J. Reeves demanded of him that he pay him $150 per month" for "permission to manufacture whisky, and to protect him from any prosecution in any state court in Titus county for said offense, and to aid him in escaping from federal enforcement officers while in Titus county," and (2) "further, that on or about February 15, A. D. 1923, while the said J. J. Reeves was the duly elected and qualified sheriff of Titus county, Tex., the said J. J. Reeves sold to Ed. Milner in Titus county, Tex., a complete outfit for the manufacture of whisky, composed of a copper pot, worm flake stand, thump key, and other parts that make up a still, and necessarily used in the manufacturing of whisky, for and in consideration of a Dodge touring car that the said Ed. Milner at the time had an equity in, the said J. J. Reeves knowing at the time that the still so sold could be used and was bought by the said Ed. Milner to be used for the purpose of manufacturing whisky, and the said J. J. Reeves agreeing at the time of the sale that he would protect the said Ed. Milner from any criminal prosecution for manufacturing whisky; that the said J. J. Reeves caused said still and all parts thereof to be transported from the county jail in Mt. Pleasant, Titus county, Tex., to the home of said Ed. Milner, 19 miles from Mt. Pleasant; that said still had theretofore been captured by the said J. J. Reeves, or some officer, while making raids for said purposes, and was being stored at the time of said sale and transportation to Ed. Milner in the county jail as contraband property, same having been used for the unlawful manufacture of whisky;" and (3) "further, that J. J. Reeves, on or about June 15, A. D. 1923, while armed with his pistol, which was exposed

and could be seen seriously threatened to take the life of Ed. Milner, who was a witness summoned to testify before the grand jury; then in session, if he told the said grand jury anything on him or testified before said grand jury as to any violations of the law of which he knew that the said J. J. Reeves was guilty of;" and (4) "that during both terms of office, and up to the time shortly before the filing of this petition [which was June, 1923] the said J. J. Reeves talked to the said Ed. Milner and promised to protect him from criminal prosecutions for violating the liquor laws of Texas, in the unlawful manufacture, sale, and transportation of liquor, and encouraged the said Ed. Milner to violate such laws, receiving from said Ed. Milner pay therefor. * * * All of which was knowingly and willfully done as sheriff, in violation of his oath of office and in violation of the laws of the state of Texas."

(5) That J. J. Reeves, while sheriff of Titus county, demanded pay from Newt Jernigan for protecting him from prosecution, and for failing to arrest him for violation of law in unlawfully transporting intoxicating liquor.

(6) That J. J. Reeves, while sheriff of Titus county, and "during both terms of the said office, conspired with the above-named persons [Arthur Tigert, Clem Gray, Ed. Milner, and Newt Jernigan] to violate the prohibition laws, and aided and encouraged them to violate said law, and willfully and corruptly failed, refused, and neglected to perform his official duty enjoined upon him by law as such sheriff in the enforcement of said law, and knowingly and willfully acted in furtherance of the object of said conspiracy, using the office of sheriff to carry out the object of said conspiracy."

The appellant answered by specially demurring to each alleged ground of misconduct, and by general denial.

After hearing the evidence the court submitted the case to the jury on a charge which, after setting out the averments of misconduct stated in the petition and the appellant's denial thereof, instructed the jury as follows:

"You are instructed that any sheriff in this state may be removed from office for official misconduct, which is defined to be any unlawful behavior in the relation to the duties of his office, and any willful or corrupt failure, refusal or neglect to perform any duty enjoined on him by law. In this case the burden is on the state of Texas to show the alleged official misconduct upon the part of John J. Reeves by a preponderance of the evidence. You will not return a general verdict, but will state in your verdict whether or not the cause or causes for removal set forth in the petition are true, and you will state in your verdict which charge or charges are sustained by the evidence, if any, and which charge or charges are not sustained by the evidence, if any. You are the exclusive judges of the facts proved and of the credibility of the witnesses and of the weight to be given to the testimony."

The jury stated in their verdict that the following alleged charges or acts of official misconduct were "sustained by the evidence," viz.: Charges as set out above in numbers

1, 2, 3, 4, and 6—but that charge No. 5 set out above was "not sustained by the evidence." Upon the verdict the court entered judgment removing appellant from the office of sheriff of Titus county. The evidence in the record amply supports and warrants the verdict of the jury.

It was pleaded, and it was admitted in the trial to be a fact, that appellant was elected sheriff of Titus county in November, 1920, duly qualifying on December 1, 1920, and again in November, 1922, duly qualifying as his own successor on January 8, 1923. The witness G. C. Gray testified, as material to state:

"I was appointed deputy sheriff on January 1, 1921, and I served as deputy sheriff until I turned in my commission in March, 1921, During the time I was deputy sheriff under Mr. Reeves there was whisky captured by the sheriff's department as illegally distilled whisky. I was in some raids with Mr. Reeves, and helped to capture whisky. When we captured whisky we brought it to the jail in Mt. Pleasant. I think we put some of the whisky up stairs in the jail, and some of it down stairs. The whisky that we got in possession that way was sold. I sold the biggest part of it myself to the sheriff, right here in Mt. Pleasant. When the sheriff first went into office he said that people thought he was all right and would not double-cross him; that he was going to get money from them, as he was broke, and needed money. He said that when people were running a still that only turned out 8 or 10 barrels of mash he would charge them $50 per month, and those running stills turning out 15 to 20 barrels of mash he would charge $75 to $100 per month, for permitting them to run stills. Those amounts were to be paid each month, not later than the 3d day of the month. He then informed me of the parties who were running stills and to be under his protection. I knew all the parties. This first conversation was at the time that he appointed me deputy sheriff. * * * After that I transacted some business under Mr. Reeves' direction with reference to Ed. Milner, Arthur Tigert, and Jesse Godsey. Jesse Godsey was making whisky; he had three outfits running. Ed. Milner usually ran a large outfit. Arthur Tigert had an 8 or 9 barrel outfit. * * * Those men would pay money sometimes, and sometimes they would pay in whisky. Sometimes I would go and get the whisky, and sometimes they would bring it up here, and sometimes they brought the money. Sometimes Mr. Reeves would get in the car and go with me to collect it. Mr. Reeves told those men making whisky that if they did not see him to pay the money or whisky over to me. He told them it would be all right to pay it over to me. When I collected whisky instead of money I would sell it and give the money to Mr. Reeves. Jesse Godsey paid off every month. He would pay whisky sometimes, and money sometimes. It was for Mr. Reeves. He paid $50 a month on one outfit, and on one outfit he paid $100 per month. I have seen Mr. Godsey pay Mr. Reeves; sometimes he would come to Mr. Reeves' office. One time Mr. Reeves was with me. We drove to Mr. Godsey's house and saw him. Mr. Godsey paid Mr. Reeves $100 that morning. If it was after the 3d day of the month, if they had not come in, he would go to them and get the money. I have seen Ed. Milner pay Mr. Reeves money two or three different times, right there in Mr. Reeves' office. I heard Mr. Milner and Mr. Reeves make the trade, when Mr. Reeves agreed to let Mr. Milner make whisky. Mr. Reeves charged him $100 a month. I heard Mr. Reeves tell Ed. Milner that he could run his stills, and that he would give him his protection, and that if the revenue men came in the county he would notify him. I know Arthur Tigert. I went with Arthur Tigert to the sheriff's office. I spoke to Mr. Reeves and told him that Arthur Tigert wanted to make whisky, and wanted to get protection. Mr. Reeves asked Arthur Tigert what size still he wanted to run, and he said he had an 8 or 9 barrel outfit. Mr. Reeves told him he would charge him $50 each month he run the outfit, for protecting him. After that Arthur Tigert delivered me some whisky for Mr. Reeves. I sold the whisky Arthur Tigert delivered, and gave the money to Mr. Reeves. Mr. Reeves never paid me any commission for collecting for him, and he never bought me a single gallon of gasoline to go in my car. I never kept a penny of the money I got for selling the whisky. I turned it all over to him. * * * I resigned as deputy sheriff for the purpose of hauling whisky myself. * * * I was doing that work for Mr. Reeves in order to get protection for myself. * * * Mr. Reeves had a little black book, which he kept in his pocket, of the account of the men who were operating under him, and who were paying. No one but Mr. Reeves and myself could have told what it was if they had found it. * * * I have hauled load after load of whisky away from jail, and I have also gone there and got grips full for other people. I did that while I was deputy sheriff, and also since then. * * * I hauled a big load of [captured] whisky away from there [the jail], 72 gallons, and put in my garage at my house. Mr. Reeves helped to load it. I paid him $5 a gallon for that whisky. I paid him for the whisky after I had sold it. * * * I had served as enforcement officer. * * * My reason for resigning as deputy sheriff was for the purpose of hauling liquor. I told Mr. Reeves that if I was going to take the risk I had as well make some money out of it. * * * In 1921 we hauled a big load of whisky from the jail to Tyler. I did not tell the grand jury that I took all of that whisky to Dallas; I said I took part of it; I may have carried some of it. I said I was handling so much whisky that I did not know whether I took any of a particular 72 gallons or not to Dallas. * * * The whisky I took away from the jail was captured in Titus county. * * * During the time Mr. Reeves was sheriff he sent me to notify the Raney boys that the revenue men were in the county. He told me to tell the Raney boys to clean up for the revenue men were here. I notified the boys."

The witness Arthur Tigert testified, as material to state:

"I had a business relation with Mr. Reeves relative to me operating a still. The first con-

versation I had was in December, 1920, or in January, 1921. After having a conversation with him I proceeded to operate a still. He wanted me to pay him $50 a month if I made whisky. I told him I could not pay it until I made some whisky, and he said 'All right,' and that I could pay it to Clem Gray if I did not see him there. I asked Mr. Reeves about the federal officers, if they would bother me. He said he would let me know in advance if they came in the county. I paid Mr. Gray $50 in the Ellis-Kelly Drug Store something like 10 days after that conversation with Mr. Reeves. While I operated a still I was not bothered by federal officers, and I did not receive any information about them. I asked Mr. Reeves about making my payments to him in whisky, and he said it would be all right, and that Clem Gray could handle the whisky. After that I saw Gray and let him have six gallons of whisky on the contract. I operated my still something like four months. I told him I was going to quit. He offered to let me make whisky for $25 a month. I did not take him up. * * * I took out of the business about four months after I started, and I have stayed quit. I am now justice of the peace, and am trying to do my best. * * * I was deputy sheriff under John Reeves last year, 1922, holding it for about six months."

The witness Ed. Milner testified, as material to state:

"A short time after Mr. Reeves qualified and went into office in 1921 he sent after me to come to his office. It was about making whisky that he sent for me. We made a contract for me to make whisky. He was to let me make it, and I was to pay him $50 a month on each outfit we run. My brothers, Ricks and Pit, were both present. After that we make whisky, and ran two or three outfits. We ran one outfit just two or three months, and paid him $50 a month. I paid him $50 in money at that time. I was supposed to pay him a month in advance. When I made the trade with him he said he would protect me against any prosecution in the state courts and would let me know if any federal prohibition enforcement officers came in the county. I could not say for sure how much I have paid John Reeves in all for the right to make whisky, but to my best judgment I have paid him at least as much as $1,500 for the right to make whisky. We first started paying $50 a month on one still, and finally got to running three stills, and was paying $150 a month for some time. I generally always made these payments to Mr. Reeves in person; I sent it one time by my brother Ricks. I have been on Mr. Reeves' list to pay for the right to make whisky off and on from the time he first went into the sheriff's office up until the present time (June, 1923). I have conferred with Mr. Reeves about revenue officers, and I have been notified by him about their presence in the county. He came to my place several times and told me that the revenue officers were in the neighborhood. Some time in May of this year (1923), I don't remember the date, Mr. Reeves came to me and told me that Mr. Allbright had eaten breakfast in Omaha (Morris county) and had started this way. Mr. Allbright is a federal enforcement officer. The revenue officers raid-ed my place several times, but Mr. Reeves was not with them."

Further, he testified:

"I bought a still from Mr. Reeves some time in March of this year [1923]. I talked to him here in town about a still. * * * He told me if I would transfer him the car he would give me a good still out of the jail, and the right to make whisky the balance of the year. That was some time in March [1923]. * * * He told me he would let me pick out any still in the jail that I wanted. He never told me where those stills came from. I went after the still the day after I transferred the car to him. When I came back and transferred the car I came in the daytime and stayed until night, and I went over to the jail myself, made the selection of the still. They were on the second floor of the jail. There were between 15 and 20 stills up there. Mr. Reeves was there with me when I selected it. He carried the connections and worm down stairs, and I carried the still down. I was intending to haul that still out in my wagon, but he said he was afraid for me to drive my wagon down to the jail, and that he would get Dewey Copeland to haul it out in his Ford car. He told me to drive on the other side and to wait for Dewey. I stayed for an hour and a half, and Dewey did not come, and I drove on towards home. I met Copeland about Bill Gan's, and he said, 'Ed, I carried your still out and left it in your smokehouse.' When I got home I examined to see if the still was in my smokehouse like he said, and it was. After I got that still I operated it some. The last whisky I made, I made it in a run on this still; it was some time in May of this year [1923]. I did not pay John Reeves any money for the right to make whisky on this still; just transferred the car to him."

Continuing, he testified:

"I was summoned June 15, 1923, before the grand jury. I saw Mr. Reeves when I came before the grand jury the first time, and he told me in the hall of the courthouse if I told on him or double-crossed him he would kill me if he went to hell the next minute. I did not tell anything. I told them that I did not know anything; that I was afraid to tell as long as Mr. Reeves was sheriff. I saw him with his gun on that day."

There was evidence to show that the still testified to by Ed. Milner was one that had been captured in a raid at Red Springs as an illicit still, and which was being held at the time in the jail as contraband. The evidence is too voluminous to further set it out in detail. The summary of the testimony offered on the part of the state goes to show a conscious, continued violation of law on the part of the respondent in wrongfully protecting, encouraging, and assisting persons engaged in the unlawful manufacture and sale of intoxicating liquors in Titus county, and in knowingly failing to enforce such law, and in hindering federal officers in searching out violations of the prohibition law. The evidence of appellant himself was a specific de-

nial of any act of unlawful conduct, and of receiving any pay for or conniving in the nonenforcement of the prohibition laws. The summary of the testimony offered in his behalf is to the effect that he diligently enforced especially the liquor laws against the manufacture and sale of intoxicating liquors, and that he assisted and did not hinder the federal enforcement officers.

J. A. Ward, I. N. Williams, J. F. Wilkinson, and Hiram Brown, all of Mt. Pleasant, for appellant.

T. C. Hutchings and Sam Williams, both of Mt. Pleasant, and J. H. Beavers, of Winnsboro, for the State.

LEVY, J. (after stating the facts as above). [1] The propositions stated in the appellant's brief in effect present the point in view, viz. that a county officer cannot be removed from office during the succeeding term, when the removal is sought, for acts involving official misconduct committed during the preceding term. According to the terms of the statute, a county officer is made amenable to "removal from office" for the specially defined causes of "official misconduct," "incompetency to discharge the duties of office," and "drunkenness while he is an officer." But it is expressly provided that—

"No officer shall be prosecuted or removed from office for any act he may have committed prior to his election to office." Articles 6030–6055, Rev. Stat.

The phrase "prior to his election to office" would, and is intended to, apply to a re-election as well as election in the first instance, since the re-election of the same officer is in legal effect the same as an original election. As the Constitution does not provide for continuity of terms of office, each "term of the office" legally becomes an entity, separate and distinct from all other terms of the same office. Consequently it would be illogical to interpret the law as meaning that an officer cannot be removed from office for any cause accruing before his election in the first instance, but he can be ousted from his second term for any cause accruing in the first term. For instance, suppose an officer voluntarily retired after the first election, or was defeated for a second or successive second term, and then several years afterwards was again elected to the same office. Could he then be removed for any cause accruing in his first term? Clearly, the object and purpose of the law is to remove the officer from the office he is then holding only for causes accruing during that precise term at which the removal is sought. The following cases are in support of that principle: Thurston v. Clark, 107 Cal. 285, 40 Pac. 435; Speed v. Common Council of Detroit, 98 Mich. 360, 57 N. W. 406, 22 L. R. A. 842, 39 Am. St. Rep. 555.

The case of Brackenridge v. State, 27 Tex. App. 513, 11 S. W. 630, 4 L. R. A. 360, does not present the question here involved. In that case, as the opinion shows, the wrongful act was committed "after re-election, but before he had qualified for the second term." In the interpretation given the statute the point made by the appellant will be sustained. Looking to the record, it appears that the petition alleged, and the fact was admitted, that appellant was elected sheriff of Titus county in November, 1920, duly qualifying on December 1, 1921; and again in November, 1922, duly qualifying as his own successor on January 8, 1923. It further conclusively appears that the alleged charges numbered 1, 2, 3, and that part of No. 6 as pertains to Clem Gray, Arthur Tigert, and Newt Jernigan, and which were specially found by the jury to be "sustained by the evidence," were all committed during the years 1921 and 1922, and entirely during the first term of office. These particular findings of the jury are therefore set aside and held for naught in the disposition of this case. Also the evidence offered respecting the charges alleged to have accrued in the first term was inadmissible, and the objection thereto was well taken.

[2] But a reversal of the judgment does not necessarily follow because of the fact that the removal of appellant was partly based on charges accruing in the first term, and that evidence was offered in support of such particular charges. Setting aside such findings and holding them for naught against appellant, as we do, operates to make the errors harmless and without injury in any way to him, as much so as if the jury had so found in his favor. Each charge alleged stands alone on the evidence respecting it. And the statute expressly requires that—

"The jury shall by their verdict say which cause they find sustained by the evidence before them, and which are not sustained."

Under this statute the trial court could have set aside and held for naught any of the special findings as without legal sanction, and still have rendered judgment on the charges sustained by proof and having legal sanction. It is not reasonable to imagine that a jury of sensible men would have based their special findings on evidence other than that pertaining to each special finding. Their verdict shows that their finding on each charge was based upon the particular evidence pertaining to that charge. A finding by the jury on one of the charges was that it was "not sustained by the evidence."

The next point made by the appellant is to the effect that the judgment and all the orders made in the proceeding are legally void because of the fact that the trial judge was a second cousin to one of the relators named in the original petition. It appears that the regular term of the district court for Titus county began on June 4, 1923, and adjourned

on July 14, 1923. On June 20, 1923, the original petition in this removal proceeding was filed in the trial court, the first paragraph being as follows:

"Now comes the state of Texas, by the district and county attorneys of the Seventy-Sixth judicial district, in Titus county, Tex., on the relation of W. W. Mason, L. M. Cargile, W. P. Traylor (and naming nine others), complaining of J. J. Reeves, defendant, and represents that each of said relators and the defendants reside in Titus county, Tex., and have resided in Titus county, Tex., more than six months prior to the filing of this petition."

. The petition was signed by the district and county attorneys. The same day, on the application of the relators, the judge granted an order, and had it entered in the minutes of the court, permitting the complaint to be filed, fixing June 29, 1923, as a day for trial, and directing the issuance and service upon defendant of citation and a certified copy of the petition. An order was also entered suspending the defendant from the office of sheriff during the pendency of the proceeding. The defendant was on that day served with citation and a copy of the petition. On June 27, 1923, the defendant filed an answer demurring to the petition and specially denying each and every allegation in the petition. On June 29, 1923, the day set for trial, by agreement of the parties the hearing was postponed until July 2, 1923. On July 2, "by agreement the case was continued until July 3, 1923." On July 3, 1923, the defendant filed a written suggestion that the trial judge was disqualified in the proceedings because related within the third degree to the relator, W. P. Traylor: "Thereupon," it appears in the record—

"the district attorney and the county attorney asked permission of the court to file an amended petition in said cause in which only the said district and county attorneys seek to prosecute this suit as relators, and in which several relators named in the original petition are eliminated, and their names do not appear."

The court granted an order authorizing the amended petition to be filed. It appears that thereupon "the relators came and voluntarily paid all the accrued costs, amounting to $68, over to the clerk of this court." Then the defendant filed an amended original answer, consisting of a general demurrer, special exceptions, and a general denial. After the amended petition and the amended answer were filed "all parties announced ready for trial," and a jury was selected to try the case. The order, or bill of exception, recites that—

"Defendant had been given a copy of the amended original petition one week before this date [on trial on July 3], and the defendant did not ask to postpone or continue the trial of this cause by reason of any facts alleged therein, and all costs accrued to this date having been fully paid, and defendant had fully answered."

[3–5] It is provided by law that a proceeding for removal from office for official misconduct "shall be conducted in the name of 'The state of Texas.'" Article 6042, Rev. Stat. The proceeding must be instituted and prosecuted in the name of the state of Texas through the proper officer of the state. Staples v. State, 112 Tex. 61, 245 S. W. 639. As held in this case, supra, a private citizen is "not possessed of legal capacity or right to institute and maintain this suit." The legal effect is to make the state of Texas, and not any relator, the plaintiff in the cause. And no person, though a formal relator, has any private interest in the proceeding. It is only in a proceeding brought for the benefit of the relator primarily as a claimant to an office he is entitled to; that such relator has, legally speaking, a private interest in the proceeding. A quo warranto proceeding for ouster for cause is simply a demand made by the state upon some officer to show cause why he should not be ousted from office because of, say, misconduct. As the cause of action is in the state of Texas for ouster from office for official misconduct, then appearance in the complaint by a private relator pertains only to form, and nothing but form. Consequently the relator Traylor and the other private relators could not be classed, within the meaning of the law, as "either of the parties to the cause," for the state of Texas in law would be the sole plaintiff. If, then, there was disqualification of the trial judge, it would rest upon the fact only that the relator, Traylor, though only formally joined in the proceeding, was nevertheless liable under the statute for costs and security therefor. This objection, though, was entirely removed by the subsequent proceedings in the cause. The district and county attorneys filed an amended petition prosecuting the cause as relators and dropping the private relators. The mere granting of leave to file an amendment is purely a formal order where nothing is decided, and one which an interested judge may enter. Cooley on Constitutional Lim. (7th Ed.) p. 595, states:

"Mere formal orders necessary to enable the case to be brought before a proper tribunal for adjudication, an interested judge may do; but that is the extent of his power."

[6] And if upon the last amendment the appellant was entitled to notice or new service, it affirmatively appears that he, in effect, waived such service when he answered and "announced ready for trial." Appellant, as the record recites, "had been given a copy of the amended original petition one week before this date [of trial]," and further, "the defendant did not ask to postpone or continue the trial of this cause." The statutory requirements that the proceeding be set for trial on a fixed date, and that notice be served on the officer, are matters that the appellant could waive. The statute fixes the

date of trial at "not less than five days from date of service," in order to give the officer a speedy hearing and a reasonable time in which to prepare for the trial. No question or doubt is raised of denial of any legal right or injury to appellant when, as here, he voluntarily appeared in court, made answer, did not ask for postponement or continuance, and "announced ready for trial" on a complaint as amended, wherein the judge was not disqualified by relationship.

[7] Appellant next insists that the court, in effect, submitted special issues to the jury in violation of the terms of the statute in respect to the form of the verdict. The court submitted a general charge to the jury in form as the statute prescribes. The appellant prepared a form of verdict for the jury, and submitted it to the court, which the court did not give, but himself prepared a form of verdict for the jury. The statute specially requires that—

"When there is more than one distinct cause of removal alleged, the jury shall by their verdict say which cause they find sustained by the evidence before them, and which are not sustained." Article 6043, Rev. Stat.

And merely to prepare a form of verdict so as to enable the jury to make findings in accordance with this statutory requirement would not violate the statute. The form, as prepared, left the jury free to make any finding upon the evidence that their own judgment dictated.

We have carefully considered the other assignments, and think that they should be overruled.

[8, 9] The evidence fully warrants such findings of the jury as to the charges concerning Ed. Milner as were shown to have accrued during the year 1923, during the second term of office. That the behavior was "in relation to the duties of his office" and "unlawful" and "willful" in its character, within the meaning of the statute, is fully shown in the evidence. The word "willful" is used in the sense of a conscious and intentional failure or refusal to perform or keep inviolate any duty imposed upon the officer by law. The said charges and findings just immediately considered would warrant the judgment entered by the trial court; and, basing the judgment of removal entirely upon these said charges, such as accrued during the second term of office, it is affirmed.