## CORNUTT v. STATE ex rel. ALEXANDER et al.

### No. 12813.

Court of Civil Appeals of Texas. Fort Worth.

Oct. 8, 1932.

Rehearing Denied Nov. 7, 1932.

Taylor, Muse & Taylor, of Wichita Falls, for plaintiff in error.

Earl P. Hall, of Henrietta, and W. E. Fitzgerald, of Wichita Falls, for defendants in error.

CONNER, C. J.

This appeal is from a verdict and judgment ousting plaintiff in error from the office of county commissioner. The action is founded upon article 5973 of the Revised Statutes, which reads: "By 'official misconduct,' as used herein with reference to county officers, is meant any unlawful behavior in relation to the duties of his office, wilful in its character, of any officer intrusted in any manner with the administration of justice, or the execution of the laws; and includes any wilful or corrupt failure, refusal or neglect of an officer to perform any duty enjoined on him by law."

Plaintiff in error was the duly elected and acting county commissioner of precinct No. 2, Clay county, and it is alleged by the state: "That as said county commissioner of said precinct No. 2, and being responsible as aforesaid and under the law for the proper expenditure and proper certification and representation as to persons entitled to receive public money upon his order in said Precinct No. 2, he has been guilty of gross carelessness, bad faith and of official misconduct in the discharge of his duties, and has wilfully and corruptly neglected to faithfully perform the duties required of him as said county commissioner, in this, towit, that sometime during the month of May, or June, 1931, the exact time being unknown to plaintiff and relators, he, the said W. E. Cornutt, wrongfully issued certain instruments called time checks for the payment of money—or for the procurement of a county warrant for money to be paid on said warrant, out of the road and bridge funds of Clay County, Texas, which said time checks were directed to the Commissioner's Court of Clay County, Texas, certifying under the hand of the said defendant, W. E. Cornutt, that certain work had been performed on the roads and bridges in said Commissioner's Precinct No. 2, which said time checks were given to one Ulys Tripp or to the Continental State Bank of Petrolia, Texas, each being in the sum of $25.00 each, and bearing date of June 30th, July 30th, August 30th, September 30th and October 30, 1931, respectively; that the said defendant W. E. Cornutt, on said time checks certified that the statement of work done as set out in each of said time checks was correct and that the work was satisfactorily done; when, as a matter of fact, and plaintiff charges the facts to be, that said time checks were not given for labor or work performed by the said Ulys Tripp, who was then an employee of the said county under the supervision of said defendant and working by the month at a monthly salary during said named months of June, July, August, September and October, 1931, as aforesaid, and that no work was ever performed for which said time checks were given, and that the said Ulys Tripp was the beneficiary by reason of said checks which certified that he, Ulys Tripp had performed the labor and was entitled to the money stated therein."

So far as necessary to state, all jurisdictional facts were admitted to exist. It was also admitted that the plaintiff in error, W. E. Cornutt, was the duly elected qualified and acting county commissioner of precinct No. 2 of Clay county, Tex., for the term of two years from and after the 1st of January, 1931, and as such took over and exercised control of all public road workmen, machinery, tools, etc., in said precinct with the general powers and duties of the commissioners as provided by statute. It was shown by the testimony of the county auditor, George Alexander, that the day laborers were compensated for their labor by what is termed "time checks" issued by the commissioners charged with the duty of supervising the workmen and determining the amount of labor done. These time checks or certificates were handed to the men in payment of the time put in on the roads. The men were required to bring them in person to the auditor for approval. If approved, they were then presented to the commissioners' court,

and if approved by that court a warrant was issued payable by the county treasurer for the amount specified. The evidence shows that one Ulys Tripp, who had worked under plaintiff in error on the public roads in precinct No. 2, applied in June or July, 1931, to the president and cashier of the Continental State Bank of Petrolia for a loan of $100. The bank refused to grant the application for the loan unless the plaintiff in error, Cornutt, would also sign the note as surety. While the note in terms did not so provide, it was agreed that Tripp was to pay it in installments of $25 a month, and the time checks in question were thereupon written and signed by the plaintiff in error and delivered to the cashier of the bank, who attached them to the note.

In answer to questions as to what was said at this time, the president of the bank testified:

"Yes, I told him (Cornutt) that if he would give me some checks that it was an evidence that he was to pay this at $25.00 a month I would attach them to the note. At the same time he asked me if I would hold them and permit him to come back and pay them off without sending them in to the county and I told them I would do that. * * *

"Q. Now that being true, did Mr. Cornutt at that time have anything to say, Mr. Perkins, with reference to the cashability or the giving of these time checks as being an obligation against Clay County? Tell the jury what was it he asked you to do, if anything? A. I just inferred from what was said and asked that they were not so regarded at that time because the work had not been performed; I agreed to hold these checks and this $25.00 was payable monthly. * * *

"Q. Did you have any purpose or intention of sending these time checks in on the day that they were given there as evidence of work or labor performed? A. No, I didn't, because I didn't do it; I held them and gave them every chance in the world to be paid. * * *

"Q. Did you ask for these (the time checks in question)? A. Yes.

"Q. Why did you ask them if their note was good? A. Just as evidence it would be paid like that.

"Q. Couldn't you have said on the note that it would be paid $25.00 a month? A. Could have, yes.

"Q. Did you know at that time that these things were dated ahead? A. Yes. * * *

"Yes, I asked about his working; I didn't ask about his dying. Yes, I said to him, I said, 'Now, you are sure you are going to keep this fellow on?' and he said, 'Yes, he is on regular.' "

Plaintiff in error testified, among other things, that he applied to Mr. Perkins, president of the bank, in behalf of Tripp, and further that Mr. Perkins said:

"I will let him have the money if you will sign the note with him. He is working for you and going to continue to work for you and if you will sign the note with him and put up some time checks to just assure me that his payments will be paid on his note in this way, to show that he is to pay $25.00 a month, I will let you have it.

"Q. Did you go back and report that to Tripp? A. I did that night when he came in and he agreed to pay it at $25.00 a month.

"Q. Now in that same conversation, I want to get what was said about the giving of those time checks. A. Here is what Perkins said: 'I would let you have the money with your signature—I will let you have the money with your signature on the note—' I had borrowed from him before—'but as the boy is working for you,' he says, 'would you mind making time checks for $25.00 a month just to show how it is to be paid monthly here on his note?' And I said, 'well, here is the thing about it: I wouldn't mind doing that but under this consideration that these checks are never to go to the Commissioners' Court for collection and I would not consider them as collateral; if you consider them as collateral I would not put them up. The boy is to pay his note $25.00 each month.'

"Q. What did he say in regard to that? A. Mr. Perkins?

"Q. Yes. A. He said he would make the loan under those considerations. * * *

"A. The way I understood Mr. Perkins he merely wanted those time checks there to show the time of each month and they wasn't to be kept as security on his note or wasn't going to the commissioner's court; that's the way I understood it."

It further appears without dispute that the workman Ulys Tripp worked for the county under the direction of appellant at a monthly salary of $100 a month; that after having paid the first installment of $25, he defaulted in the four succeeding payments, and that Mr. Perkins, the president of the bank, without the knowledge or direction of appellant, proceeded to deliver the time checks to the auditor for his examination, approval, and submission to the commissioners' court, according to the usual course. When appellant was informed of this, he, with Tripp's consent, secured from the commissioners' court a warrant for $100 due Tripp in payment for his monthly salary and with it went to the auditor and deposited it with him and took up the several time checks that had been given to the president of the bank. There is no evidence that even tends to show that the time checks at any of the proceedings became a legal liability of Clay county or that they were ever used or disposed of in any way other than as herein related. Appellant was ex-

plicit in his testimony that he did not have the purpose at any time that the time checks should be perfected or used in any way other than to show the method or manner of Tripp's payment of the bank's note against him.

In addition to the terms "incompetency" and "gross carelessness," the court defined the terms "official misconduct" and "willful" as follows:

"By the term 'official misconduct' as used herein is meant any unlawful behavior in relation to the duties of his office, willful in its character, of any officer intrusted with the execution of the duties of his office; and includes any willful or corrupt failure, refusal or neglect of an officer to perform any duty enjoined on him by law.

■■ "By the term 'willful,' as used herein, is meant a conscious and intentional failure or refusal to perform the duties of his office or the conscious and intentional doing of acts in violation of his duty as an officer."

Pretermitting a discussion of questions which relate to several grounds for removal upon which the action was based as immaterial by reason of the fact that the findings of the jury thereon were in plaintiff in error's favor, plaintiff in error in various forms, as by exception to the petition, to the court's charge, to the refusal of special instructions, and otherwise, complains of the judgment below more particularly upon error in the court's definition of "willful" and insufficiency of the evidence to sustain the judgment. We think these objections must be sustained. The charge and the penalty assessed is highly punitive in character, amounting, as it does, to a forfeiture of an office of honor and emolument and the imposition of a stigma upon the good name of the commissioner. This being true, as we think it is, we think the court's definition of the term "willful" was too general in character. It was apparently dictated by what was said in the opinion of Judge Willson, of the Court of Criminal Appeals, in the case of Brackenridge v. State, 27 Tex. App. 513, 11 S. W. 630, 631, 4 L. R. A. 360, or in the opinion of Judge Levy, of the Texarkana Court of Civil Appeals, in Reeves v. State, 258 S. W. 577. We think the following definitions are more properly applicable to actions of the present character:

"It is not every intentional act that is a willful or wanton act. When used in a penal statute, the word 'willful' means more than it does in common parlance. It means with evil intent, or legal malice, or without reasonable ground for believing the act to be lawful. In common parlance it is used in the sense of intention, as distinguished from accidental or involuntary. To make the killing of the sheep, therefore, a willful act, it must have been committed with an evil intent, with legal malice, and without legal justification. In a trial for malicious mischief in shooting

a dog, evidence that the presence of dogs among defendant's sheep at the time of the killing would have frightened the sheep, and caused the ewes, which were heavy with lambs, to lose them, was admissible to rebut the charge of malice and wantonness in shooting the dog. Caldwell v. State, 115 S. W. 597, 55 Tex. Cr. R. 164, 131 Am. St. Rep. 809 (quoting and adopting Thomas v. State, 14 Tex. App. 200)." 4 Words and Phrases, Second Series, 1295.

And again from the same volume, page 1294:

"'A "willful" act is an obstinate, stubborn, perverse, act; and an act done willfully is one done stubbornly, by design, with set purpose.' Claus v. Chicago Great Western Ry. Co., 111 N. W. 15, 17, 136 Iowa, 7 (quoting and adopting definition in Stewart v. Burlington & M. R. Co., 32 Iowa, 561). * * *

"'Doing o romitting to do a thing knowingly and "willfully,"' said the Supreme Court, in Felton v. United States, 96 U. S. 702, 24 L. Ed. 875, 'implies not only a knowledge of the thing, but a determination with a bad intent to do it or to omit doing it. "The word 'willfully,'" says Chief Justice Shaw, "in the ordinary sense in which it is used in statutes, means, not merely voluntarily, but with a bad purpose." Commonwealth v. Kneeland, 20 Pick. (Mass.) 220. "It is frequently understood," says Bishop, "as signifying an evil intent without justifiable excuse." 1 Crim. Law, § 428.' See, also, Potter v. United States, 155 U. S. 446, 15 S. Ct. 144, 39 L. Ed. 214. Referring to the word 'willful,' as employed in a penal statute, Judge Pardee, speaking for the Circuit Court of Appeals, in Roberts v. United States, 126 F. 904, 61 C. C. A. 427, quoted with approval the following language used by the Court of Appeals of Texas in Thomas v. State, 14 Tex. App. 204: 'In a penal statute the word "willful" means more than it does in common parlance. It means with evil intent, or legal malice, 'or without reasonable ground for believing the act to be lawful. State v. Preston, 34 Wis. 675; State v. Clark, 29 N. J. Law, 96; Savage v. Tullar, Brayton (Vt.) 223; United States v. Three Railroad Cars, 1 Abb. U. S. 196, 28 Fed. Cas. 144 [No. 16,513]. In common parlance it is used in the sense of intentional, as distinguished from accidental or involuntary.' 'To the same purport,' said Judge Pardee, 'see Sam Lane v. State, 16 Tex. App. 172; Wood v. State, 16 Tex. App. 574; Shubert v. State, 16 Tex. App. 645. See, also, Owens v. State, 19 Tex. App. 249, where the court approved "by willfully, as used in this charge, is meant that the act was done without reasonable ground to believe the act of taking was lawful."' It was said by Mr. Chief Justice Stayton, speaking for the Supreme Court of this state, in State v. Alcorn, 14 S. W. 664, 78 Tex. 393: 'It is universally held that the word "willful," when used in a

penal statute, means with evil intent or without reasonable ground to believe the act lawful.' United States v. Praeger [D. C.] 149 F. 474, 478."

See, also, Reeves v. State (Tex. Civ. App.) 258 S. W. 577; Thomas v. State, 14 Tex. App. 200.

We conclude that the court committed error in his definition of the term "willful," and that the evidence is wholly insufficient to enable us to say that under the proper definition the jury's finding would have been adverse to appellant. It is accordingly ordered that the judgment below should be reversed, and the cause remanded for such proceedings, if any, as the facts and law will warrant. All costs of appeal are to be taxed against the relators, M. M. Alexander, W. W. Barger, Orus O. Ross, Jr., J. T. Petro, J. A. Whitmore, and George S. Myers.

### On Motion for Rehearing.

Appellee presented a forceful motion for a rehearing in this case based on the contention that appellant on the trial did not object to the court's definition of the terms "official conduct" and "willful," and on appeal has not presented any assignment of error complaining of such definitions, and hence under well-settled rules that need not be here repeated we were without jurisdiction to reverse the judgment on the ground we did.

 It is true that neither on the trial nor here did appellant in direct form or manner complain of the court's definitions, but on original consultation it seemed plain that the judgment would have to be reversed on the grounds, if for no other, to wit, that the court refused to correct his charge to the jury in that it failed to require a finding that appellant had acted in bad faith and corruptly as charged. Appellant excepted to the charge on this ground, and we think the exception well taken. The court also refused to give appellant's special requested charge directing to find in appellant's favor in event they found his issuance of the time checks, etc., was, as he explained, in good faith and without corrupt motives as his evidence tended to show. This also constituted error.

This being the condition, the writer was of the opinion that the faulty definitions were at the seat of the trouble; that, if corrected, the errors just above noted would surely be corrected on another trial, but that if no notice of the definitions was made the errors of definitions might again appear, there having been no objection thereto. The writer therefore went by indirection to the heart of the subject as set forth in our original opinion. The fact is, as the writer thinks, the court's definitions constitute fundamental error and hence reviewable regardless of the want of exception and assignment of error. It is the statutory duty of the court in jury trials to deliver a written charge "on the law of the case." The burden is on the plaintiff to establish the material allegations of his petition by a preponderance of the evidence. The plaintiff in this case expressly alleged that the acts complained of were done willfully and corruptly. The allegations were material without doubt if the authorities cited in our original opinion declare the law of the case. The charge was a general one, and it nowhere required a finding that appellant's acts were done in bad faith and corruptly. Nor does the verdict of the jury or the judgment of the court contain such findings. Such condition of the record, in the opinion of the writer, constitutes fundamental error. See Tex. Jurisprudence, vol. 3, § 574; Speer's Law on Special Issues, § 532.

 However, the majority think it unnecessary to determine whether the error in the court's definition is fundamental and hence express no opinion on that subject for the reason, in which the writer concurs, that the record shows that appellant in due time and form excepted to the court's charge on the ground, among other things, that it "does not take into contemplation or does not in any wise take into consideration the defense pleaded by the defendant in that said purported time checks were only given as evidence of the method and manner of the payment" (of the Tripp note), etc. We think this criticism of the charge well taken and that the court erred in failing to make the correction indicated.

 The court also refused to give defendant's special charge which in terms and effect submitted the defense that the time checks "were given only for the purpose of evidencing the time and amounts of the payments to be made by Ulys Tripp," etc. We think it evidence that the court erred in refusing this charge.

It follows, all concurring, that the motion for rehearing should be overruled, and it is so ordered.