VAN SICLEN v. BARTOL et al.

(Circuit Court, E. D. Pennsylvania. July 31, 1899.)

1. RAILROADS—REORGANIZATION COMMITTEE OF BONDHOLDERS—PERSONAL LIABILITY.

A reorganization committee of railroad bondholders, who were given large discretion and expressly exempted from personal liability for their acts, except in case of willful malfeasance or gross negligence, cannot be held liable for the failure of a plan of reorganization which proved impracticable, where they acted in good faith and with reasonable diligence, though it afterwards appeared that they may have made mistakes; nor for a failure fully to set out in a circular to the bondholders the reasons for the abandonment of such plan and the adoption of another, where the plaintiff, a bondholder, made no inquiry for further information, and by his own negligence failed to respond in time to share in the benefits of the plan as finally carried out.

2. SAME—EXPENSES OF COMMITTEE.

A committee of bondholders of an insolvent railroad company attempted to arrange a plan of reorganization, which was unsuccessful, and afterwards a second plan was devised, in which other bondholders joined. *Held,* that such bondholders could not be charged with the expenses incurred by the committee in the former attempt, to which they had not assented.

This was an action by a bondholder of an insolvent railroad company against the members of a reorganization committee for alleged breach of duty.

John W. Weed and F. R. Shattuck, for complainant.

Wm. C. Hannis, for respondents.

McPHERSON, District Judge. In this proceeding the plaintiff seeks to enforce a liability growing out of an alleged breach of duty on the part of the defendants while acting as a reorganization committee in behalf of certain bondholders of the Chattanooga Union Railway Company, and also to compel an accounting for money of the plaintiff, contributed in aid of the reorganization, part of which is averred to be still in the defendants' hands. The facts, about which there is little dispute, are as follows:

1. The railway company owned a short line of road in and near the city of Chattanooga, connecting with other railroads entering that city. In 1890 the plaintiff became the owner of second mortgage (otherwise called "first consolidated") bonds to the amount of $10,000, binding the property of the railway company. Other outstanding bonds of the same issue increased the aggregate to $100,-000, and the company's property was further incumbered by a first mortgage of $100,000, and a third mortgage of $400,000. Towards the end of 1891 the company passed into the hands of a receiver, and from this time forward no interest was paid on its bonds. A short time after the receivership began, suits were brought to foreclose the first two mortgages. The defendants, either personally or as trustees, were owners of $14,000 of the first mortgage bonds, and $44,000 of the second mortgage bonds,—$8,000 more of the first mortgage bonds being owned by George Bartol, a brother of one of the defendants; and, some months after the insolvency of the company became manifest, they took steps to protect their interest in the property. These steps resulted in the appointment of the de-

fendants as a reorganization committee by certain of the first and second mortgage bondholders. During the year 1893 and much of the year 1894, efforts to adjust the company's affairs were made by the defendants under this appointment, but nothing was accomplished. The plaintiff took no part in these attempts.

2. In November, 1894, a second attempt at reorganization was set on foot by the defendants in the interest of the first and second mortgage bondholders, and in this the plaintiff joined. The chief features of the plan were these: It was proposed to create a new mortgage on the company's property, and to issue bonds thereunder sufficient in amount—First, to pay the liens that were prior to both mortgages (such liens having accrued during the receivership, or having been established in the suits to foreclose), and the expenses of reorganization, and to obtain such sum as might be necessary to maintain and improve the property; second, to pay the principal of the first mortgage bonds; and, third, to pay the principal of the second mortgage bonds and the accumulated interest on the first mortgage bonds. A foreclosure sale being inevitable, the defendants, who were the committee on reorganization under this plan, were authorized to buy the property for such sum as they might see fit to bid. As one means of raising the money for this purpose, the committee were empowered to sell the bonds of the new company on such terms as they might deem wise. They were also given the power to make contracts for merging, leasing, or operating the new company. The committee were to be reimbursed for their expenses, and were to receive a reasonable compensation for their services. The plan also provided an additional means for raising the necessary cash. The owner of each first mortgage bond, on depositing his security with the Farmers' Loan & Trust Company of New York, was to pay $100 to the trust company, agreeing to pay $300 more whenever the committee should call for it. In like manner the owner of each second mortgage bond was to pay $100 on depositing his security, and $500 thereafter. If all the bonds of both issues had come into the plan, this would have given the committee $100,000 in cash from this source alone. Other provisions of the plan were as follows:

"(4) The committee shall be the sole judge when and whether a sufficient amount of bonds have been deposited to make the plan operative, and shall have power, if they deem it advisable, to abandon it, in which case the securities deposited shall be returned to their owners upon surrender of the certificates issued for the same and the payment of their pro rata share of the expenses."

"(8) That the committee shall have the power to modify this plan of reorganization if, in their judgment, deemed necessary; but, in case such modifications are made, a copy thereof shall be filed with the trust company, and a copy sent to the post-office address of each subscriber, and depositors not objecting in writing within thirty days shall be deemed to have assented thereto. Any depositor objecting within said thirty days may withdraw his bonds upon first paying his pro rata share of expenses incurred to that time."

"(13) * * * The committee shall not be personally liable in any case for the acts of each other, nor for their own except in cases of willful malfeasance or gross negligence, nor shall they personally be liable for the acts of their agents or employés. They shall have power to fill vacancies in their number, to act through agents, and delegate authority as well as discretion to such agents.

"(14) The committee may construe this plan of reorganization, and their construction of the same, or any part thereof, shall be final, and they may supply defects and omissions in said plan, necessary, in their opinion, to carry it out properly and effectually."

"(24) The money deposited shall be subject to the orders of the committee for the purpose of carrying out this agreement, but, if the committee abandon the carrying out of a reorganization plan, they shall return the securities deposited hereunder and such portion of the cash deposits as has not been expended, together with a statement of disbursements, and their reason for abandoning the reorganization."

3. The plaintiff assented to the foregoing plan, deposited his bonds with the trust company, receiving the usual certificate therefor, and paid $1,000 in cash. Of the other second mortgage bonds, $57,000 came into the agreement, making $67,000 in all; but only $24,000 of the first mortgage bonds signified their assent. The cash paid in, therefore, was $9,100, and the total cash available, either on hand or promised, was $76,600. No market could be found for the securities of the proposed new company; and as the liens prior to the mortgages were alone found to be about $76,000, without taking into account the expenses of reorganization and the $76,000 of nonassenting first mortgage bonds, it was evident that the committee did not have sufficient funds available to buy in the property under the plan.

4. It remained to see whether help could be had from the third mortgage bondholders, who had a separate committee of their own, or from the other railroads that entered Chattanooga and connected with the line of the Union Railway Company. It was necessary to act with promptness, for in March, 1895, decrees of sale were entered by the United States court, and about the middle of April the sale was advertised to take place on the 17th day of June. Negotiations were carried on by the defendants with the parties just referred to, but without effect. Late in May, 1895, the third mortgage bondholders finally refused to do anything whatever, deciding to sacrifice their interest altogether, and the railroads, with one exception, declined to consider the matter at all. The exception was the Southern Railway Company, controlling the Alabama Great Southern Railroad Company, and with the officers of these companies continuous and prolonged negotiations were had. Propositions and counter propositions were exchanged, but nothing definite could be concluded. At last, towards the end of May, the president of the Southern Railway Company made an offer (hereafter stated in paragraph 6) which seemed to afford the only means of securing anything for the second mortgage bonds. But, as this offer was radically different from the plan proposed by the agreement of November, 1894, it was necessary to abandon that agreement.

5. Accordingly, on May 29, 1895, the defendants formally abandoned the plan to which the plaintiff had assented, and on that day notified all the assenting bondholders of the abandonment. The notice set forth that the committee found it impracticable to carry out the plan; that the depositors were at liberty to withdraw their bonds; and that, as soon as the property was sold and the accounts of the committee made up, the unexpended balance of the money

contributed would be refunded. There was then outstanding an unsettled claim for attorneys' services, which was not finally adjusted until September, and this prevented a determination, and an immediate return, of the unexpended balance. The notice was duly received by the plaintiff on May 30th. He made no effort to withdraw his bonds until the following August, although the committee had also notified the trust company that the bonds could be withdrawn; but the fact that the bonds remained with the trust company is of no importance, since he continued to hold the certificate of deposit, and this certificate sufficiently represented the securities.

6. The Southern Railway Company controlled all the railroads, save one, entering the city of Chattanooga, and it was therefore in complete control of the situation. It could make the Union Railway Company's property valueless by withholding traffic, and it was therefore able to dictate the terms upon which it would aid the committee to buy at the foreclosure sale. Its final offer (referred to in paragraph 4) was this: The defendants were to buy the property, the Southern Railway Company furnishing the cash to pay the liens prior to the mortgages and the other necessary disbursements, and were thereupon to organize a new company. This company was to put a first mortgage of $300,000 on the property; bonds to the amount of $25,000 were to be retained in the treasury for purposes not now material; bonds amounting to $100,000 were to be exchanged for the principal of the first mortgage bonds of the Union Railway Company; and bonds at the rate of 70 cents on the dollar were to be exchanged for the second mortgage bonds of that company, unless the Southern Railway Company exercised an option to pay 40 per cent. in cash of the principal of such second mortgage bonds on or before the 1st day of September, 1895, in which event the 70 per cent. bonds were to be delivered to the Southern Railway Company. This option was afterwards exercised, and the cash was paid. Income bonds for $24,000 were also to be issued in exchange for past-due coupons on the first mortgage bonds of the Union Railway Company. The Southern Railway Company was to lease the property for not less than 50 years from July 1, 1895, at a rental equal to the interest on outstanding bonds, agreeing, also, to pay taxes, operating expenses, and cost of maintenance. The committee was to receive $3,000 for the expenses of reorganization under this agreement. The offer applied only to such first and second mortgage bondholders as should accept its provisions and deposit their bonds with the committee on or before June 15th. These bonds were to be deposited with the Southern Railway Company before the day of the sale. This arrangement was agreed to about June 8th, and on that day the following registered letter was sent to the plaintiff:

"Union Ry. Co. of Chattanooga.. Reorganization Committee.    532 Drexel
                                  Building.
                                                "Philadelphia, June 8, 1895.

    "Dear Sir: We notified you on May 29th that the plan was abandoned. We send you herewith a proposition for a new plan. If you desire to accept the same, its terms must be complied with not later than June 12th. No answer

being received from you within the time mentioned, will be regarded by the committee as a refusal on your part to join with the other bondholders under the terms of said agreement.

"Yours, truly, H. W. Bartol, Chairman."

The proposition referred to was as follows:

"Agreement, made this eighth day of June, 1895, between H. W. Bartol and Lawrence Johnson, acting as a committee for first consolidated mortgage bondholders of the Union Railway Company of Chattanooga, hereinafter called the 'committee,' and the undersigned holders of first consolidated mortgage bonds of said railway company, hereinafter called 'parties of the second part': Whereas, the committee have negotiated a certain agreement with Samuel Spencer and S. M. Felton, representing the Alabama Great Southern Railroad Company, whereby the committee are authorized to buy in said property at a figure agreed upon; and whereas, should they purchase said property of the Union Railway Company, the said bondholders becoming a party to this agreement will receive either a new first mortgage bond for seventy per cent. of the face value of their present bond, or four hundred dollars per bond in cash; and, should they not buy the property in, then said committee will collect for the parties, the second mortgage bondholders becoming parties to this agreement, their proportion of their distributive share realized at said sale: Now, this agreement witnesseth, that the parties of the second part becoming parties to this agreement shall not later than June 12th, 1895, deposit with the committee, at the office of H. W. Bartol, 532 Drexel Building, Philadelphia, their bonds, together with the cash assessment of one hundred dollars per bond, to be used for the expenses and compensation of the committee. Any amount heretofore paid to the Farmers' Loan and Trust Company of New York on said bonds will be credited on said one hundred dollars per bond. Bondholders who have already deposited their bonds with the Farmers' Loan and Trust Company of New York, and have not withdrawn the same, may deposit instead the receipts they received from the Farmers' Loan and Trust Company, duly indorsed to the order of the committee. The committee act in this matter solely as a committee, and assume no individual responsibility beyond that they will act in good faith, and shall only be liable for gross negligence."

The plaintiff lives at Jamaica, Long Island, and should have received this letter on June 9th. It did not come into his hands, however, until the afternoon of June 10th. His certificate was in the custody of a bank or trust company in the city of Brooklyn, distant nine or ten miles from Jamaica, and, if he had chosen to do so, he could readily have obtained the certificate on June 11th, and have mailed it so as to reach Philadelphia on the following day. For greater certainty, he might have used the telegraph. He did nothing, however, but allowed several days to go by without action of any kind. Meanwhile $88,000 of first mortgage bonds and $44,000 of second mortgage bonds came into the agreement. The foreclosure sale, which had been advertised for 60 days, took place on June 17th. The property was bought in under the plan of June 8th, and the plaintiff's opportunity was gone. A few days afterwards he sought to share in the benefits of the agreement, but the Southern Railway Company refused to admit any other bonds than those assenting before June 15th.

Under these circumstances, the plaintiff seeks to hold the defendants liable for willful malfeasance or gross negligence; but I am unable to find the evidence to sustain so serious a charge. The defendants were trustees for the plaintiff and other bondholders, but the agreement under which they were acting protected them

from the ordinary liability of a trustee. A large discretion was confided to them, as is no doubt necessary in such cases, and they were expressly relieved from liability unless they should be guilty of "willful malfeasance or gross negligence." Of willful malfeasance—a conscious, deliberate breach of trust—there was certainly none. The defendants had no discernible motive to exclude the plaintiff's bonds from the third plan. They could not profit by such exclusion. On the contrary, they lost over $400 that he would have paid to them under the third plan if he had come in, and no other motive for breaking faith can be found in the testimony. Fraud is not to be conjectured; and in the present case I not only see no proof of corrupt dealing, but I am satisfied that the defendants acted in good faith throughout.

The charge of gross negligence must also be dismissed. I think the defendants made some mistakes, but it would not be fair to judge them by the light which can now be thrown backward upon a difficult and trying situation. For example, Mr. Felton, the vice president of the Alabama Great Southern Railway Company, with whom they were at first negotiating, may have been occupying their attention with offers that he did not mean to carry out. It is at least conceivable that he was consuming time while the sale was approaching, in order that a final proposition of his company's own choosing might be made at so late a day that refusal would be scarcely possible. The conduct of Mr. Spencer, the Southern Railway Company's president, lends some plausibility to this supposition. He appears late upon the scene, repudiates Mr. Felton's propositions, insists upon beginning a new negotiation, and practically compels the acceptance of the plan that was finally carried out. But, to believe now in the Southern Railway Company's dexterous management, and to conclude that the defendants were grossly negligent, because they did not so believe in April or May, 1895, would be by no means convertible terms. The defendants are to be judged by the light then at their command, and, thus judged, I do not think they would have been grossly negligent, even although they might have been overreached. But there is another explanation of the ineffective negotiations that may also account for their failure. During this period different interests seem to have come successively into control of the Alabama Great Southern,—the Southern Railway Company coming latest, and shortly before the foreclosure sale, —and these changes of masters may have been reflected in the changing offers that met the committee from time to time. Whatever the explanation may be, I have been unable to find that the committee carried on the negotiations either negligently or in bad faith.

I think, too, it was an error in judgment not to give the depositors of bonds more detailed reasons why the plan of November, 1894, could not be carried out. It was impracticable, and that was no doubt a good reason for abandoning it; but the bondholders would have been more satisfactorily served if the facts that led the committee to this conclusion had been given more fully. But it would, I think, be going very far to declare this omission to be gross negligence; especially in view of the undenied and undeniable fact that,

even if the plaintiff had had the fullest information, he was powerless to take a single step to help himself, unless he acted with the other bondholders, whom the defendants represented. He could not command the money to pay the liens prior to his own, and the fullest detail of the facts that supported the defendants' conclusion would have done him no practical good. Moreover, there is no reason to doubt that, if he had asked the committee for further information, he would have received it; but he did not ask for it, and I am unable to find now, as a fact, that his conduct would have been determined in any important respect by the fullest report. Certainly he was under some obligation to use diligence when he learned that the plan had been given up, and that his interests were again in his own hands. He could have learned in two or three days all the facts which he now complains were withheld, but he wrote no letter and sought no advice.

I am not prepared to say that the defendants were wrong in naming June 12th as the last day for receiving bonds. The agreement with the Southern Railway Company named June 15th; but there is force in the argument that two or three days' margin was not unreasonable, in order that the necessary details might be attended to before the final date. But, even if this was another mistake, it was a mistake in good faith. It cannot be successfully maintained that the change in date was intended to injure or exclude the plaintiff or any other bondholder, and it is also plain that it did not injure the plaintiff, for he made no effort to comply with the notice of June 8th, and apparently did not then intend to take any further step. Indeed, it is at this point, if at no other, that this branch of his case breaks down. If he had been ordinarily diligent on June 11th, he would have saved his rights, and have come in with the other bondholders. He was busy on the farm, he says, and could not attend to it. He admits that he could have written or telegraphed in time, but says that he let it drift. I cannot avoid the conclusion that his loss is due to his own negligence. He was bound to be diligent. Although the time was no doubt short, it was long enough to enable him to act, and he must bear the consequence of inaction.

My conclusion, therefore, is that neither the charge of gross negligence nor of willful malfeasance is made out, and that the plaintiff is not entitled to recover on this branch of the case.

It remains to consider the second branch,—the claim to an account of the $1,000 in cash deposited with the trust company. Of this amount he has already been repaid $430.80; but he claims to recover $424.30 in addition, alleging that he has been overcharged by that sum. Further facts bearing upon this question are as follows:

7. Under the first reorganization agreement, which was made in June, 1893, expenses were incurred amounting to $1,646.59. More than half of this ($835.46) was paid to an expert, who examined the railroad, and made a thorough and careful report upon its condition and prospects. Of the rest, $500 is a retaining fee paid to counsel in Chattanooga. The total charges for expenses during the period from June, 1893, to May 29, 1895, which do not include com-

pensation for the defendants' services, aggregate $1,579.39. This sum the committee charged proportionally upon the 91 bonds deposited under the agreement of November, 1894, thus reaching a charge of $56.92 upon each bond. The apportionment is made upon the theory that the work done before November, 1894, was useful to the bonds deposited under the agreement of that date, and, indeed, was so necessary that, if it had not been previously done, it would have certainly fallen upon the subscribers to that agreement. There is some force in this argument, but, after full consideration, I am not able to adopt it. What might have been necessary is after all speculative, and I think it is the safest course to lay upon the parties to each agreement no more than the expenses incurred under that particular contract. They authorized no other outlay, and there is nothing to support the charge against them of expenses previously incurred, except the implied ratification that may be inferred from the supposed benefit which they may have derived from such expenses. Under the facts in proof, this benefit is so uncertain that I do not feel justified in deciding that the defendants' apportionment is correct. The $3,000 paid to the defendants under the agreement with the Southern Railway Company was for expenses and services after June 8th, and is therefore not to be taken into account.

The result is that the plaintiff has been overcharged as follows:

Total expenses to May 29, 1895, per account...................... $5,179 39
Less expenses under agreement of June, 1893.................... 1,646 59
                                                                 _____
    Expenses under agreement of November, 1894............... $3,532 80

—Or $38.82 upon each of the 91 bonds deposited under that agreement, making the plaintiff's share of the expenses $388.20. He was therefore entitled to have refunded in cash $611.80, instead of the $430.80 that he has already received. For the balance ($181), with interest from October 3, 1895, he is entitled to a decree, with costs of suit.