## THOMPSON v. HAYS et al.

(Circuit Court of Appeals, Eighth Circuit. February 10, 1926.)

No. 6964.

**I. Trusts ⬅179—Trustee must exercise highest good faith, but is not insurer of results, and not responsible for error in judgment.**

Trustee in management of trust property must exercise highest good faith, keeping ever in mind interest of beneficiary, but is not an insurer, and is not responsible for mere error in judgment or mistake.

**2. Trusts ⬅179—Where trust agreement specifically limited trustee's liability to matters of "willful default," general rules held inapplicable.**

Where trust agreement specifically provided that trustee should not be personally liable except for "willful default," ordinary rules as to responsibility of trustee are inapplicable.

**3. Trusts ⬅179—"Willful default," as used in agreement describing trustee's liability, means an affirmative wrong.**

"Willful default," as used in agreement relating to liability of trustee, means something more than involuntary, inadvertent, mistaken, careless, or accidental fault, and means an intentional designing failure to do or not to do something required—an affirmative wrong.

[Ed. Note.—For other definitions, see Words and Phrases, Second Series, Willful Default.]

**4. Trusts ⬅179.**

Trustee may so neglect duties or disregard interests of beneficiary as to be guilty in law of willful default.

**5. Trusts ⬡⟿179—"Willful," as used in connection with willful default of trustee, means with bad purpose, some element of turpitude, designedly, intentional.**

"Willful," in sense of a willful default of a trustee, means with bad purpose, some element of turpitude, some degree of deliberation, intentional, designedly, purposely, and not merely voluntarily, but knowingly, and of stubborn purpose.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Willful—Willfully.]

**6. Trusts ⬡⟿262—Evidence as to trustee's management of real property in interest of bondholders held insufficient to show willful default.**

Evidence as to trustee's management of real property in the interest of bondholders *held* insufficient to show a willful default, though subsequent development showed error in judgment and substantial loss to bondholders within a short time.

Appeal from the District Court of the United States for the Western District of Missouri; Arba S. Van Valkenburgh, Judge.

Action by Inez Thompson against Frank P. Hays and others. From a judgment of dismissal, plaintiff appeals. Affirmed.

William G. Holt, of Kansas City, Mo. (James M. Johnson and Donald W. Johnson, both of Kansas City, Mo., on the brief), for appellant.

F. C. Donnell, of St. Louis, Mo. (Seldon P. Spencer, of St. Louis, Mo., and H. L. McCune and R. B. Caldwell, both of Kansas City, Mo., on the brief), for appellees Hays and Wright.

Clifford Histed, of Kansas City, Mo. (William O. Thomas, of Kansas City, Mo., on the brief), for appellee Kemper Inv. Co.

Before KENYON, Circuit Judge, and YOUMANS, District Judge.

KENYON, Circuit Judge. This action is one in equity brought by appellant Inez Thompson against appellees Frank P. Hays and H. P. Wright, as trustees, for an accounting and judgment, and against appellee Kemper Investment Company, for an injunction to prevent its selling or disposing of the property in controversy.

The trial court found in favor of all defendants (appellees here), sustaining at the close of plaintiff's (appellant's) evidence a motion to dismiss the bill on the ground that the evidence introduced was not sufficient to entitle this appellant to a decree.

In 1910 appellant purchased $8,000 worth of bonds of an issue of $110,000 of the Benton Building & Investment Company of Kansas City, Mo. (hereinafter designated the Benton Company), secured by a deed of trust to the Mississippi Valley Trust Company of St. Louis on a leasehold and a business building in Kansas City. On January, 1, 1914, there was a default in the payment of interest on all the bonds.

The trusteeship which appellant claims was violated was created May 1, 1914, by a written instrument, and related to the care, control, and sale of this property.

The specific charges of violations of the trust in the complaint are that Hays and Wright refused to lease the property to tenants who would pay adequate rent for the storerooms, but permitted it to stand empty, allowing taxes and ground rents to accumulate; that they refused to permit appellant to co-operate with her cobeneficiaries in redeeming the property from the debts against it; that without authority or adequate consideration they sold and transferred the property to the Interior Land Company; that they permitted one Frank Terry to mortgage the property to the Commerce Trust Company (a corporation) for $30,000, that they permitted the property to be sold to Kemper Investment Company (a corporation) for $47,000.

Appellant's theory is that the evidence shows breaches of duty both of nonfeasance and misfeasance on the part of the trustees of a serious and culpable nature, and that the Kemper Investment Company as purchaser of the property had full knowledge of the trust and of all the acts of the appellees.

As the case necessarily involves a review of the facts, we state them as briefly as possible.

The Benton Company was organized as a subsidiary of the Jones Store Company, which owned a large department store on Twelfth street in Kansas City, Mo. The purpose was to finance and construct a building to be used in connection with the Jones Store Company upon leaseholds on ground adjacent to the Jones Store which had been acquired by the Benton Company, and which ran for a period of 50 years. The Benton Company issued bonds in the sum of $110,000 for the purpose of erecting this building, secured by deed of trust with the Mississippi Valley Trust Company as trustee. The building was erected in 1910, and was leased to the Jones Store Company for a very substantial rental, but this company failed shortly thereafter, going into receivership, and the lease was repudiated by the receiver with the approval of the court, and thus ended. It was a four-story building, the entrance to the upper floors was through the Jones Store,

and there was no general entrance to the first floor. There was no passenger elevator, nor were there water, toilets, or plumbing on the upper floors. The general condition of the building was known to the attorney for appellant at the time the $8,000 of bonds were purchased. The Benton Company was obligated to pay a ground rental of $8,250 per year up to 1915, and thereafter $12,500 per year.

On January 1, 1914, there was default in the interest on the bonds, as before stated. The charges for ground rent, taxes, etc., then amounted to about $8,000, and had been advanced by the Mississippi Valley Trust Company as trustee under the terms of the mortgage, and were a lien upon the property prior to the first mortgage bonds. This company refused to advance any more money. The Benton Company had transferred its title to the Kentucky Realty Company, which seemed to be giving little attention to this building. During all this period the upper floors of the building had been idle. The rents derived were not sufficient to pay the amount due under the ground leases. The H. P. Wright Investment Company, of which appellee Wright was president, owned a portion of the bonds, and appellee Wright, together with appellee Hays, who either owned or represented some of the bondholders, and both of whom had sold some of the bonds, devised a plan to try and save the situation by the formation of a protective committee. Counsel for appellant had full knowledge of the situation, and on May 1, 1914, a written agreement known as a protective agreement was entered into, under the terms of which nearly all of the bondholders, including appellant, deposited their bonds with the Mississippi Valley Trust Company as depositary. Appellees Hays and Wright were designated under this instrument as a committee having large powers, among which were the power to sell any part of the bonds for cash, to buy the mortgaged property, or to borrow money thereon. The paramount purpose of this arrangement was to bring about a sale of the property, and that apparently was the desire of all parties concerned.

In order to clear the title to the property, the trustees brought about a foreclosure by the Mississippi Valley Trust Company. It was duly advertised for sale. To meet this situation the committee made arrangements with the Commerce Trust Company of Kansas City, Mo., to borrow $13,500, the note for which they personally signed. The agreement with that company provided that the committee, Hays and Wright, were to use the $13,500 to buy the property at foreclosure and to take care of the current needs thereof, the property to be bought in the name of the Interior Land Company, a subsidiary of the Commerce Trust Company. There are many other provisions in the agreement of more or less importance, one of which is that the Commerce Trust Company was to have exclusive agency for the sale, rental, and placing of insurance upon the property while the title remained in the Interior Land Company. The property was sold at public auction, as contemplated, July 15, 1914, for $8,117.49, being the amount required to reimburse the Mississippi Valley Trust Company, and the trustees' deed was made to the Interior Land Company. The bondholders were fully advised of this proceeding in writing. Counsel for appellant received one of the explanatory notices. No objection was made by appellant. The committee kept on trying to sell the building, especially to the Jones interests, by negotiations with its representative, Judge New. It was also placed in the hands of many of the leading real estate agents in Kansas City for sale. Business conditions in the country were depressed, making a sale difficult. The trustees increased some of the rentals on the first floor, but succeeded in receiving only about $600 per month as rentals. The building outside of the first floor remained idle. It would have required the expenditure of considerable money to have placed a passenger elevator in the building, to have constructed a main entrance, a lobby, and to make some other changes necessary for the rental of the upper floors. These matters were all placed before the bondholders in letters by the committee. The only bona fide offer the committee received for the purchase of the property was $75,000 from F. P. Neal. This offer was refused. The indebtedness on the property continued to increase until by the end of the year 1915 it aggregated approximately $30,000. Wright and Hays had the property deeded to one Frank Terry by the Interior Land Company, who placed a mortgage thereon for $30,000 to the Commerce Trust Company, and on the same date deeded the property back to the Interior Land Company. The purpose of this is explained in the evidence. The committee reported this to the bondholders, and no objection seems to have been made by any of them. Matters ran along, and no sale of the building was made, nor was anything done to put it in condition for advantageous leasing. The notes to the Commerce Trust Company were renewed a number of times. On June 8,

1916, the indebtedness against the property amounted to about $40,000. The committee on January 6, 1916, and June 8, 1916, made full report of the situation to the bondholders in which a showing was made of the amount the committee had advanced personally. The Commerce Trust Company was threatening to foreclose, and a meeting of the bondholders was called to meet in St. Louis on June 16, 1916, for the purpose of working out some plan to prevent loss of the property. This was attended by a representative of appellant who had full knowledge of the situation, and knew of the demands of the Commerce Trust Company for its money. August 28, 1916, under its trust deed, the Commerce Trust Company advertised the property for sale. The protective committee, Hays and Wright, secured an extension of 60 days in order to formulate some plan to save the situation, and, if possible, dispose of the property, but were unable to accomplish anything. They prepared a syndicate agreement which was sent to all the bondholders which provided for raising a fund to be used in bidding on the property at the foreclosure sale. Some money was raised by contributions of bondholders. At said sale the syndicate manager, Mr. Donnell, bid $47,100, the amount of money contributed by the bondholders under said arrangement. The Kemper Investment Company bid $47,200, and on November 28, 1916, secured the property subject to $6,354.84, taxes and ground lease rentals, making the selling price practically $53,554.84. December 30, 1916, the Kemper Investment Company executed a deed of trust to B. C. Howard, Trustee for Commerce Trust Company to secure a loan of $65,000. On May 16, 1918, the Kemper Company conveyed the leaseholds and building by warranty deed to the Jones Store Company (the Claflin Corporation) for a consideration of $125,000, subject to the deed of trust executed by the Kemper Company, upon which there was owing the sum of $50,000 ($15,000 having theretofore been paid thereon). The actual consideration therefore was $175,000.

Appellant contends that, while the petition does not contain specific averments of fraud or bad faith, the trustees were guilty of general breaches of trust which proceeded either from motives of bad faith or gross negligence, which in equity and morals should be regarded as the equivalent of bad faith.

[1] The general rule of law as to a trustee holding real property in trust to sell and dispose of the proceeds thereof is expressed in 3 Pomeroy's Equity Jurisprudence, § 1070, as follows: "The principle is well settled that trustees are bound to exercise care and prudence in the execution of their trust in the same degree that men of common prudence ordinarily exercise in their own affairs. A trustee, in other words, must use the same care, skill, diligence, and prudence in his management of the trust and his dealings with the trust property which a man of ordinary care, skill, and prudence would use in his own transactions and his own property under like circumstances; and the trustee is answerable for all losses, deficiencies, and injuries which are occasioned by his affirmative or negative violation of this obligation." 26 R. C. L. p. 1280, § 130; In re Adams' Estate et al., 70 A. 436, 221 Pa. 77, 128 Am. St. Rep. 727, 15 Ann. Cas. 518; In re Kline's Estate, 124 A. 280, 280 Pa. 41, 32 A. L. R. 926; Belding v. Archer et al., 42 S. E. 800, 131 N. C. 287; In re Hart's Estate, 53 A. 364, 203 Pa. 480; Winder v. Nock et al., 52 S. E. 561, 104 Va. 759, 3 L. R. A. (N. S.) 415, and cases there cited. The rule should be even stronger than expressed above, as a person dealing with his own property may exercise prudence or not as he may choose. A trustee, however, must exercise the highest good faith, keeping ever in mind the interests of the beneficiary, but he is not an insurer of results, and is not responsible for mere error of judgment or mistake. 26 R. C. L. p. 1280, § 130; Ripley v. McGavic et al., 94 N. W. 452, 120 Iowa, 52; Wylie v. Bushnell et al., 115 N. E. 618, 277 Ill. 484.

The cases cited by appellant have been read and considered. They do not fit the situation presented here. It must be remembered that the trusteeship under consideration is a limited one. It was created by the written instrument of May 1, 1914, and the responsibilities of the committee as trustee are established, defined, and limited by that instrument. To that extent the parties to this appeal are in accord. In placing her bonds with the depositary appellant agreed to a trusteeship limited by the terms of the written instrument. We turn therefore to the instrument. It provides in paragraph 11 as follows: "The members of the committee shall not be personally liable for the acts or omissions of each other, or for the acts or omissions of any other member or of any depositor, agent, or attorney, or of the depositary, or for any error of judgment or mistake of law or fact, but each shall be liable only *for his own willful default.*" Paragraph 4 of the instrument provides: "No limitation is imposed on the powers of the

committee as the legal owner, except the duty of doing whatever is in its opinion calculated to protect and promote the best interests of all of the depositors." It will be observed that this instrument grants the trustees broad powers with narrow liability.

[2] Appellees Hays and Wright had the right to insist upon a limitation of their liability under the law ordinarily applicable to trusteeships if they were to accept the position. They seem to have carefully guarded and restricted liability. Appellant assented to this, and the limit of their liability is fixed by this instrument, which clearly provides that the members of the protective committee are not to be held liable for error of judgment or mistake of law or fact, but only *for willful default*. Therefore the rules of law applicable to the ordinary trusteeship are not entirely applicable here.

[3] What is "willful default," as the term is used in the instrument of May 1, 1914? It means more than involuntary, inadvertent, negligent, mistaken, careless, or accidental default. It means an intentional designing failure to do or not to do something required —an affirmative wrong. Van Siclen v. Bartol et al. (C. C.) 95 F. 793; In re Mallon's Estate, 89 N. Y. S. 554, 43 Misc. Rep. 569; Winslow Warren and Others, Trustees, v. Elizabeth B. Pazolt and Others, 89 N. E. 381, 203 Mass. 328.

In Van Siclen v. Bartol et al., supra, the court refers to willful misfeasance as "a conscious deliberate breach of trust."

In re Mallon's Estate, 89 N. Y. S. 554, 43 Misc. Rep. 569, where a trustee had been relieved from liability except for willful default, the court said: "The words 'willful default' imply more than negligence or carelessness. The word 'willful' means intentional, while the word 'default' means transgression."

In Warren v. Pazolt, 89 N. E. 381, 388, 203 Mass. 328, 347, the court said: "Willful default means intentionally making away with the trust property and a willful neglect means such reckless indifference to true interests of the trust as to amount to or partake of a willful violation of duty."

[4] It is doubtless true that a trustee may be guilty of such wanton or willful neglect of his duties, such reckless indifference to and disregard of the interests and rights of the beneficiary, that the law will hold him guilty of a "willful default." Henry L. Doherty & Co. v. Rice et al. (C. C.) 186 F. 204; Kessler & Co. et al. v. Ensley Co. et al. (C. C.) 129 F. 397.

[5] The meaning of the word "willful" has been before the courts frequently in the construction of penal statutes, and, while there may be some shades of difference where it is so used, and its use in contracts, nevertheless the language of the courts in construing the term as used in criminal statutes is helpful. It has, when so used, been held to mean "with a bad purpose"; "with some element of turpitude"; "knowingly and of stubborn purpose"; "with some degree of deliberation"; "intentional and deliberate"; "not merely voluntary"; done "designedly," "intentionally," "purposely." See Potter v. United States, 15 S. Ct. 144, 155 U. S. 438, 443, 39 L. Ed. 214; Commonwealth v. Abner Kneeland, 20 Pick. (Mass.) 206, 220; Williams v. People, 57 P. 701, 26 Colo. 272; State v. Stein, 51 N. W. 474, 48 Minn. 466; North Carolina v. Vanderford (C. C.) 35 F. 282; United States v. Edwards (C. C.) 43 F. 67; In re Maples (D. C.) 105 F. 919, 921; Felton v. United States, 96 U. S. 699, 24 L. Ed. 875. It is a strong and forceful word, and, when deliberately used, should be given its full force and effect.

[6] Are the facts and circumstances disclosed under this record sufficient to show willful default of the trustee; measured by the tests hereinbefore laid down?

The general result of the handling of this property by the trustees cannot be satisfactory to any court. Looking back upon the matter, it is quite apparent now that the trustees should have borrowed money, as the Kemper Investment Company did, placed the building in condition for renting, and rented it until the period of depression had passed and an adequate price could be realized from a sale. It is not pleasant for the bondholders who have parted with their money to contemplate that this security was sold for approximately $53,000, and shortly thereafter the purchaser made a loan of $65,000 thereon, and two years later sold it for $175,000. The trial court says that the price for which the property was sold in 1916 was not such an unconscionable amount as compared with its market value as to challenge a court of equity to correct it; that in his opinion the market value in 1918 was at least double what it was two years before. The trial judge was a resident of Kansas City, and knew the values of properties. His conclusions on that question are, of course, very persuasive, and the evidence does show that the market value of the property had greatly increased in 1918 over what it was two years before. It is little wonder that bondholders complain where it appears that in about twenty-eight months of trusteeship of a val-

uable building the indebtedness had increased until it reached approximately $44,000, while the income during that period was about $14,000, showing expenditures of approximately $58,000 during that time, and the whole thing finally resulting in a catastrophic climax out of which the bondholders received less than $3,000.

The proceedings resulting in the foreclosure of the property by the Commerce Trust Company might be suspicious if unexplained. However, we realize there is no claim of fraud. If appellees Hays and Wright had the property transferred to Terry, the mortgage of $30,000 put onto the Commerce Trust Company by him, the property immediately reconveyed to the Interior Land Company, and then manipulated matters so that the Commerce Trust Company brought foreclosure, and sale was made at foreclosure to the Kemper Company, of which Mr. Kemper was the chief officer, he being also one of the officers of the Commerce Trust Company, thus cutting out the bondholders, and were all of this done pursuant to some arrangement to which the trustees were parties, there would be ample to sustain a charge of willful default on the part of Hays and Wright. This, however, under the testimony, could be no more than a matter of surmise, and such charge is only inferentially made, if at all. The record would have borne a more pleasing aspect if the foreclosure sale had been to some one not connected with the Commerce Trust Company in any way.

The main complaint of appellant is that, it being apparent the building could not be sold to advantage, the building or store and office rooms should have been rented on long-time leases, and held until a substantial price could be realized by a sale, and that as a matter of law the failure to enter into long-time leases when they had no purchaser constituted a "willful default." Appellees reply that long-time leases would have prevented a sale. This, of course, was a matter of business judgment. The building apparently was constructed for the purpose of supplying the Jones Store Company with additional space. It was not arranged for renting to others. The evidence shows it would have required the expenditure of large sums—$35,000 to $50,000—to have placed it in proper condition for renting. To be used as a separate building it would have been necessary to have its entrance on Thirteenth street, which the testimony shows was a poor business street; the trial court in its opinion saying, "The most unattractive street in the city for a person to go on." On account of

the heavy expense of ground rent, taxes, etc., a considerable income was required to keep the property going. That things were proceeding from bad to worse, and were in very much of a mess, is shown by the necessity of forming the bondholders' protective committee. The attorney for appellant knew the situation of this building before purchasing the bonds, and knew that it was in the nature of an annex to the Jones Dry Goods Company building; knew the upper floors were empty. When the committee took charge in July, 1914, they had to contend with various and sundry problems. The natural thing was a sale to the Jones interests, and apparently they repeatedly endeavored to bring about such event. The evidence shows that they entered into a number of negotiations for the leasing of portions of the property; one looking toward a consolidated ticket office for the railroads; another with Bradstreets; another with the Standard Oil Company; another with the Rock Island Company for terminal offices. They placed the sale of the building in the hands of several leading real estate agencies in Kansas City. It cannot be said they made no effort to lease, or that they did not make good-faith efforts to sell. The difficulty in the leasing proposition was the impracticability of the building for occupancy by a number of tenants and the high cost of remodeling it to remove this handicap.

It is urged that the trustees practically abdicated their trust in favor of the Commerce Trust Company. The evidence shows that the trustees attempted to borrow the needed money from other sources than the Commerce Trust Company. It also appears that said company did not foreclose until about two years after its right so to do accrued. Under the arrangement with the Commerce Trust Company the trustees retained full power to negotiate a sale of the property independent of such company upon payment of the indebtedness thereto. The trust company was the rental agent for the trustees, but the final authority as to tenants, rents, etc., rested in the trustees. That the Commerce Trust Company handled the business is not a matter of much import. The agreement of May 1, 1914, provided that the trustees could employ agents, and the trust company was apparently acting as the trustees' agent.

It is much easier to know after failure what should have been done to avoid it than to know before. Measured by results, the trusteeship certainly evidences a mistake of judgment or policy. That is not sufficient to charge the trustees with willful default. On

oral argument counsel for appellant disclaimed any charge of fraud. The bondholders were fully advised of the situation at stated and proper times. There was no attempt to conceal anything from them. The record shows no profit to the trustees outside of their compensation in the transaction. One of them owned some $16,000 of the bonds, and is a heavy loser. The District Court heard the witnesses, and found the trustees were not under the evidence properly chargeable with willful default. We think his finding was not erroneous. This conclusion disposes also of the appeal as to the Kemper Investment Company. The judgment and decree of the District Court is affirmed.