**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 25 2003**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

ELAINE CHAO, Secretary of Labor,
United States Department of Labor,

  Plaintiff - Appellee,

v.

ROCKY'S AUTO, INC., a corporation,

  Defendant - Appellant,

  and

DAVID J. ROTHROCK, individually;
MARK SALAK, individually;
DONALD BOWERS, individually,

  Defendants.

No. 01-1318
(D.C. No. 99-M-1130 )
(District of Colorado)

**ORDER AND JUDGMENT**[*]

Before **EBEL**, **PORFILIO**, and **O'BRIEN**, Circuit Judges.

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. This court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

The only question presented in this appeal is whether certain employees of Defendant-Appellant Rocky's Autos Inc. qualify for exemption from overtime pay as "salesmen" as that term is employed in the Fair Labor Standards Act, 29 U.S.C. § 201 - 219. After a bench trial, the district court entered oral findings of record concluding the employees were not salesmen. Judgment was entered against Rocky's in the amount of $85,392.66 for overtime pay plus interest for 19 employees. After review, we hold the findings of the district court are not clearly erroneous, and its conclusions of law are correct. We affirm.

The statutory premise of this case is 29 U.S.C. § 213(b)(10)(A), which exempts from payment of overtime:

> [A]ny salesman . . . *primarily engaged in selling* . . . automobiles, trucks, or farm implements, if he is employed by a nonmanufacturing establishment primarily engaged in the business of selling such vehicles or implements to ultimate purchasers.

(emphasis added). Also pertinent is 29 C.F.R. § 779.372(c)(1):

> As used in section 13(b)(10), a salesman is an employee who is employed for the purpose of and is *primarily engaged in making sales or obtaining* orders or *contracts for sale of the vehicles* or farm implements which the establishment is primarily engaged in selling. Work performed incidental to and in conjunction with the employee's own sales or solicitations, including incidental deliveries and collections, is regarded as within the exemption.

(emphasis added). Under the regulation, the definition of "primarily engaged" is: the major part or over 50 percent of the salesman's . . . time must be spent in selling . . . the enumerated vehicles. 29 C.F.R. § 779.372(d).

On appeal, Rocky's contends the district court improperly found employees, variously called "finance managers" or "finance contractors" (finance employees), are not primarily engaged in selling automobiles. Rocky's argues these employees are an integral part of the sales process because they obtain contracts for the sale of vehicles.

There are unquestioned distinctions in the jobs performed by Rocky's salesmen and finance employees. Salesmen meet the customers, determine what they are interested in, take the customer for a test drive, and negotiate the price of the car, including trade-in, payment amount, and financing options.

After the salesperson and sales manager conclude their negotiations with the customer, a "sales packet" is created. The packet includes the amount of the down payment, the trade in allowance, the interest rate, the length of the loan, and the payment amount of each contract. After full determination of all these factors, the packet is then sent to a finance employee, who inputs the data in the packet into a computer which prints out necessary documents containing the terms agreed upon between the salesman and the customer.

The finance employee will then attempt to sell the customer an extended warranty option. These extended warranty options are sold separately by the finance employee and provide the finance employee with additional income. The finance employee is also required to make sure the customer carries insurance, answer questions about the documents, and have the customer sign them when completed. This entire process

ordinarily takes between 20-30 minutes, although one former finance employee, Brandon Markgraf, testified management wanted it limited to fifteen minutes.

Although the witnesses generally agreed with the scope of the finance employees' responsibility, testimony concerning their specific duties and functions conflicted. The disagreement centered over the amount and extent to which finance employees have and exercise authority to alter the terms and conditions of the sales contract.

Current management-level employees testified the finance employees have discretion to alter the contents of the packet received from the sales staff to change interest rates, length of the contract, amount of payments, and the date upon which the first payment is due. They were vague, however, about how often this authority was exercised. In contrast, former finance employees testified they rarely, if ever, made alterations in the contract or its terms. For example, Mr. Markgraf testified he never determined interest rate, number of payments, length of the loan, and the amount of the down payment. Jorge Armstrong also testified to the same experience.

More importantly, all of the testifying former finance employees stated the information contained in the sales packet was exactly what they use to perform their function. They input that information into a computer when prompted by the "pretty basic" software program.

In contrast, Rocky's relies upon the testimony of Roger Maxson, the current used car manager, and Georgia Ann Griest, the finance manager. Both testified finance

employees have the authority to change terms and conditions of the sales contract. However, it is clear from their testimony the only reason why those changes can be made is to accommodate the sale of the extended warranty options.

For example, Ms. Griest testified there are many variables in the options contracts dependent upon the extent of coverage and the term of the warranty, each sold at a different price. In each instance, the additional cost of the warranty purchased by a customer increases the overall cost of the agreement. Therefore, if a customer is adamant about the maximum monthly payment he or she wanted to make, concessions must be made in some part of the contract to keep the monthly payment within that range.

Ms. Griest clarified that when a warranty option is sold, "it changes the payment amount, . . . the buyer's order, . . . the contract, bank contract, and . . . Rocky's disclosure because it will change the payment amount." Thus, the finance employee must make alterations in the papers. She added, "[i]f we are offering a warranty and the price becomes too high" she could "extend[] the term an additional six months." She also noted she could change the interest rate to secure the sale of the warranty after talking to Don Bowers, the finance director. However, she could only extend the repayment period to accommodate the sale of a warranty agreement. On cross examination, she agreed, when she receives the sales packet, the price of the vehicle, the term of the loan (if any), and the interest already had been determined.

Mr. Maxon concurred. He stated, for example, the finance employees have "the latitude to be able to change the interest rate to a lower one to be able to sell extended service contracts." He added they could "possibly increase the term" to achieve the same objective. Both Mr. Maxon and Ms. Griest agreed with the government's witnesses, however, the finance employees could never change the sales price of a vehicle.

Rocky's witnesses also asserted the finance employees were integral to the sale because they were called upon to calm any fears of the customer over the pending sale and, in the process, had to exercise "sales skills." Again, the testimony conflicts.

Both Mr. Maxson and Ms. Griest elaborated that customer concerns could ruin a sale; consequently, the finance employee who quelled those fears could "save the sale." Thus, they said, the finance employees review the terms of the papers they prepared and answer any questions.

Ms. Griest disagreed somewhat with Mr. Maxson about the finance employees' role in saving sales, for she stated if a problem arose over the sale that presented a question she could not answer, she always called upon the salesperson or the sales manager to resolve the difficulty. Moreover, she thought her primary duty as a finance employee was "to disclose the deal to the customer." That meant meeting face to face and going over all the documents. Although assuring the finance employees had to have "sales skills," neither she nor Mr. Maxson made any attempt to describe how often those skills are called upon.

Former employees, however, indicated this task of reviewing the documents with the customer involved making only a brief description of terms in the language of the papers. They added the documents also cautioned the customers they should read the papers themselves, although few did. In contrast to the testimony of Rocky's witnesses, Mr. Armstrong stated he "rarely" had a customer who "got hesitant about the deal." When pressed, he stated he could remember such a problem occurring about four times during his whole career as a finance employee. On those occasions, he relied upon the salesperson or the sales manager. Stephanie Matheison testified that if a customer began to express doubt about a sale, "[t]he deal would come to a stop and I would page the sales person or the sales manager involved in that particular negotiation, and let them know. And at that point they would address the issue with the customer." When asked by Rocky's counsel whether she nevertheless had to rely upon her "sales skills in completing that sale," she responded, "I think that's again subjective. I mean again we had some people who worked in finance that didn't have any personality."

After hearing this testimony and judging the credibility of the witnesses, the district court made several findings. First, the court determined Rocky's suggestion that the finance employees are engaged in "obtaining" the sales contract was "not a reasonable interpretation of [the] regulation or indeed of the statute to say that *these people* are obtaining a contract or that they are primarily engaged in selling automobiles." (emphasis added). Agreeing finance employees are an "integral part of the sale of an automobile,"

the court observed the "test is whether they were selling the car." In this case, the court found, the Rocky's finance employees were not. "[T]o transfer the person who appears at the lot interested in buying a car from an interested potential customer into a customer, that's done by the salesman. And it's that in my view that is critical to any definition of selling. It's what's necessary to get a customer to sign a deal."

The court further found the task of the finance employees is to:

> take the sales packet that gets delivered to them and input it into the computer so that the computer prints out the necessary forms, which vary according to the terms of the deal . . . . Then it's the obligation of these people, these employees, to go over all of that paper with the customer . . . to make sure the customer is fully informed and satisfied.

The court also found that "at times" customers had questions abut the transaction which required reassurance by the finance employee who used "interpersonal skills that are involved in good selling." But, the court concluded "that's not selling in the sense that the statute and the regulation mean." The court added, "I don't think that obtaining the contract means obtaining it from the computer. Obtaining the contract means obtaining a customer willing to sign a contract, and that's what sales people do. That's not *this* job." (emphasis added).

In determining whether an exemption to the Fair Labor Standards Act applies, we review the district court's factual determinations for clear error, and its legal conclusions de novo. ***Sanders v. Elephant Butte Irr. Dist. of N.M.***, 112 F.3d 468, 470 (10th Cir. 1997). The employer carries the burden of establishing that its employees qualify for the

exemption. *Id.* Further, exemptions are "narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit." *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960).

Rocky's first argument that the contractors "obtain" contracts ignores the facts found by the district court. Although its witnesses supported that theory with vague generalities, their testimony was specifically rebutted by the government's witnesses. Obviously finding the government's witnesses more credible, the district court chose their version and made findings supported by that evidence. Where there are two permissible views of the evidence, the fact finder's choice of which to apply cannot be clearly erroneous. *Anderson v. City of Bessimer City, N.C.*, 470 U.S. 564, 574 (1985).

We believe the district court's holding was confined to the facts of this case and the evidence presented describing the tasks performed by Rocky's finance employees. The district court found in this case those facts support the conclusion the finance employees' tasks are essentially ministerial in nature. We agree. *Compare Gieg v. Howarth*, 244 F.3d 775, 776-77 (9th Cir. 2001).

Moreover, we believe the evidence relating to the discretionary authority of contract employees disclosed that authority was restricted to accommodating the sale of extended warranties. There is no testimony that the sale of those warranties was necessary to effect the sale of any vehicle. Indeed, the evidence supports the opposite

inference.  It is evident the extended warranties were marketed to customers as a collateral benefit to them but resulted in additional revenue for Rocky's.  More importantly, its own witnesses made clear that unless the customer purchased an extended warranty, the contract was not changed by the finance employee and, when completed, contained the terms of agreement relayed by the sales staff.

Thus, we conclude Rocky's failed to carry its burden of proof.  Although Rocky's finance employees play a role that is integral to the business of selling cars, they are not primarily engaged in obtaining contracts for the sale of vehicles.  Therefore, as a matter of law, they are not exempt from overtime pay.

**AFFIRMED**.

ENTERED FOR THE COURT

John C. Porfilio
Senior Circuit Judge

01-1318, <u>Chao v. Rocky's Autos, Inc.</u>
**EBEL, Circuit Judge, dissenting.**


In my view, the majority's interpretation of 29 C.F.R. § 779.372(c)(1) renders superfluous its language covering employees who "obtain[]... contracts for sale of vehicles." I therefore respectfully dissent.

The majority rightly notes that because the district court rendered its decision after a trial, we owe great deference to its factual findings, reviewing those findings only for clear error. However, as the majority also recognizes, we review the district court's legal conclusions de novo. It is a legal error, not a factual error, that the district court made here. The court erred by asking the wrong legal question, framing that question as "who does the selling." While that approach tracks the language of the applicable <u>statute</u>, <u>see</u> 29 U.S.C. § 213(b)(10)(A) (granting the overtime exemption to "any salesman... primarily engaged in selling or servicing automobiles"), it ignores the plain language of the Labor Department <u>regulation</u> that has interpreted that statute to define what "salesman" means.[1]

That regulation defines "salesman" as <u>both</u> an employee who is "primarily engaged in <u>making sales</u>" <u>and</u> as one who is "primarily engaged in... <u>obtaining contracts</u>."

---

[1]The Ninth Circuit case cited by the majority, <u>Gieg v. Howarth</u>, 244 F.3d 775 (9th Cir. 2001), contains a similar error, focusing solely on the statute and ignoring the regulation altogether. In fact, I am aware of no reported case that has interpreted the regulation at issue here. We are thus left with common sense and canons of construction to guide us in interpreting the text of the regulation.

29 C.F.R. § 779.372(c)(1) (emphasis added).[2]  "It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." TRW Inc. v. Andrews, 534 U.S. 19, 31 (2001) (internal quotation marks and citations omitted).  The district court violated this principle by conflating the two meanings of "salesman" as defined in the regulation.  It stated that "[o]btaining a contract means obtaining a customer willing to sign a contract, and that's what sales people do.  That's not this job."  On its face, that interpretation equates "making sales" with "obtaining... contracts," thus rendering the latter language superfluous.[3]

The "obtaining... contracts" language in the regulation "cannot be regarded as mere surplusage; it means something."  Potter v. United States, 155 U.S. 438, 446 (1894). In this case, it means the process by which Rocky's Autos acquires a legally binding agreement that obligates a customer to purchase one of its cars.[4]  The testimony at trial made clear that the finance contractors are an integral part of that process.  For example,

---

[2]The relevant section of the regulation states: "a salesman is an employee who is employed for the purpose of and is primarily engaged in making sales or obtaining orders or contracts for sale of the vehicles or farm implements which the establishment is primarily engaged in selling."  29 C.F.R. § 779.372(c)(1).

[3]The majority attempts to explain away this error by treating the district court's determination as an evidentiary one about witness credibility, when it is not.

[4]Black's Law Dictionary defines "obtain" as "[t]o get hold of by effort; to get possession of; to procure; to acquire, in any way."  Black's Law Dictionary 972 (5th ed. 1979).  Nothing in that definition, or in any other definition of which I am aware, suggests that "obtaining" is a single event as opposed to a process.

they are authorized to 1) exercise some discretion as to whether a customer is eligible to buy an extended service contract; 2) sell extended service contracts; 3) change the interest rate by a point or two; 4) alter the customer's monthly payment (as a result of any change in the interest rate); 5) raise the down payment (if the customer buys an extended service contract and wants to keep her monthly payment the same); and 6) change the payment term (e.g., from 48 to 54 months, which typically happens when an extended service contract is sold; changes of more than six months must be approved by the finance director). Like the salesmen, the finance contractors lack the authority to change the price of the car without first obtaining the approval of a sales manager.

While it is true that the finance contractors do not initiate the contract-obtaining process, they do complete it. When a customer enters the finance contractor's office, there is no contract; there is simply the outline of an agreement that the customer may walk away from at any time. By the time the finance contractor has finished his job, the customer has signed a binding contract. The finance contractor has guided the customer though the final stages of the sales process, explaining the contract to him, answering his questions and using his salesmanship skills to resolve any doubts the customer might have. The finance contractor's job is a quintessential one of contract-obtaining. I would thus conclude that, as a matter of law, the finance contractors "obtain[]... contracts" within the meaning of the regulation.

That does not end the inquiry, however. The regulation also requires that, to fall within the overtime exemption, an employee must be "<u>primarily engaged</u> in making sales or obtaining orders or contracts for sale of the vehicles." 29 C.F.R. § 779.372(c)(1) (emphasis added). "Primarily engaged" means that "the major part or over 50 percent of the salesman's... time must be spent in selling or servicing the enumerated vehicles." 29 C.F.R. § 779.372(d). Having reviewed the record, I am doubtful that the Rocky's contractors spend more than 50 percent of their time obtaining contracts. But that is a factual issue not to be resolved in the first instance at the appellate level.[5]

In sum, I would reverse the district court's determination that the finance contractors do not "obtain[]... contracts" and remand with instructions for the court to determine, as a factual matter, whether the finance contractors are "primarily engaged" in "obtaining... contracts" as I have here interpreted the latter term.

For the foregoing reasons, I must respectfully dissent.

---

[5]The district court found that "the evidence has not established that these people [finance contractors] are salesmen or that they are primarily engaged in <u>selling automobiles</u>." It also found that "there aren't very many questions" asked of finance contractors during their portion of the sales process. Those are not, however, determinations that the finance contractors were not "primarily engaged" in "<u>obtaining... contracts</u>." Because the district court made its findings while laboring under what I believe to be an erroneous legal interpretation of the regulation, I would accord no deference to its findings on the "primarily engaged" question.